MARTA VILLANUEVA, demandante y recurrida, v. CATALINO HERNÁNDEZ CLASS, EL VOCERO DE PUERTO RICO, INC. y OTROS, demandados y peticionarios.

Número: CE-88-720 Resuelto: 25 de junio de 1991

622

624

*Juan R. Marchand Quintero* y *José E. Colón Rodríguez*, de *Rivera Cestero & Marchand Quintero*, abogados de El Vocero de Puerto Rico, peticionario; *Gregorio Lima*, abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

■ En la solución del presente recurso nos ha guiado la firme convicción de que la diseminación de información por la prensa en la forma más amplia posible resulta ser esencial para el bienestar general de nuestra ciudadanía; *ello por razón de que una prensa libre de temores y presiones litigiosas es indudablemente un requisito indispensable de una sociedad democrática como la nuestra. Cf. Associated Press v. United States,* 326 U.S. 1, 20 (1945).

■ El presente recurso nos permite *la oportunidad de adoptar en esta jurisdicción dos doctrinas jurisprudenciales desarrolladas en protección del derecho a la libertad de prensa que consagra el Art. II, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1, a saber: la doctrina del privilegio del reporte justo y verdadero y la doctrina de la defensa del comentario imparcial.* El mismo, además, nos brinda la oportunidad de expresarnos no sólo sobre la utilidad y procedencia del mecanismo procesal de la sentencia sumaria en casos de libelo en general sino que, en específico, respecto a la carga de la prueba requerídale, en esta etapa de los procedimientos, a un demandante que es considerado "persona privada", a diferencia de "figura o funcionario público".

I

Los hechos que dieron margen al presente recurso resultan ser sorprendentemente sencillos. El 11 de noviembre de 1981 el diario *El Vocero de Puerto Rico* (El Vocero) publicó una noticia en la cual se informaba que la Sra. Marta Villanueva, profesora de la Escuela Intermedia Josefina Quiñones, había sido acusada de interferir con la labor de la Policía y de alterar la paz en relación con unos sucesos alegadamente ocurridos durante una manifestación de protesta celebrada el día anterior frente a las oficinas del Superintendente de Escuelas para el Distrito Escolar de Río

Grande,(1) sucesos que tuvieron como consecuencia la radicación de dos denuncias contra la profesora Villanueva.(2) Transcurridos dos días de la publicación del artículo, esto es, el 13 de noviembre de 1981, El Vocero publicó un editorial sobre los mismos hechos titulado "Un Mal Ejemplo". En el mismo, luego de hacerse un recuento de lo sucedido durante la demostración, se tildó de irresponsable e injustificada la conducta de la profesora Villanueva, se hizo un llamado a los padres para que protestaran este "ejemplo poco edificante" que en última instancia sólo contribuía a convertir a sus hijos en "estorbos públicos", y se criticó la iniciativa de la profesora de incitar a los estudiantes a

(1) En el artículo en cuestión se informó, en lo pertinente, que:

"Según la información ofrecida sobre el incidente por el coronel Catalino Hernández, a las 3:00 P.M. de ayer la profesora Villanueva, hermana de Adolfina Villanueva y otros maestros de dicho plantel, dirigieron un grupo de más de 300 estudiantes de la Escuela Superior Pedro Falú que montaron un piquete de protesta frente a las oficinas de la Superintendencia Escolar del Distrito de Río Grande en la Calle Loíza. La protesta era debido a las malas condiciones del plantel por causa de unas reparaciones que se efectúan. Los protestantes atravesaron vehículos en la calle interfiriendo el libre tránsito de dicha vía.

"Para facilitar las mejoras a la Escuela Superior, las autoridades escolares dispusieron el traslado de los estudiantes a la Escuela Intermedia. En medio de la protesta, según se alega, la profesora Villanueva incitó a los jóvenes David Rodríguez Rodríguez, de 20 años de edad e Higinio Cruz Varela, de 19, ajenos a ambos planteles y a cinco menores de edad que participaban en el piquete, a tirar las basuras contenidas en drones que había frente a la oficina del Superintendente a la calle. Cuando la Policía quiso intervenir para evitar que se siguiera tirando la basura, Marta Villanueva interfirió con la labor de los guardias." Apéndice, pág. 16.

(2) Las denuncias radicadas por el policía Raúl Maldonado Coreano el 10 de noviembre de 1981 contra la Sra. Marta Villanueva ante el Tribunal de Distrito de Río Grande leían como sigue:

Denuncia Núm. 529:

"La referida acusada MARTA VILLANUEVA, allí y entonces ilegal, voluntaria[,] maliciosamente[,] a sabiendas y con la intención criminal en la fecha, hora y sitio arriba indicados alteró la paz y tranquilidad a los policías Raúl Maldonado Coreano 9167 y Oseas Torr[é]ns Castro 2054, adscrito en el Distrito de Río Grande, profiriéndole frases obscenas, mal sonantes e indecorosas tales como: PERROS SUCIOS, ASESINOS, MATONES: todas éstas dichas en alta voz al alcance de oído de mujeres y niños alterándose la paz y tranquilidad a los perjudicados quienes se alarmaron. En el momento de ocurrir estos hechos, se encontraban en gestiones oficiales." Apéndice, pág. 20.

Denuncia Núm. 530:

"La referida acusada MARTA VILLANUEVA, allá en o para el día 10 de noviembre de 1981, en Río Grande, Puerto Rico, que forma parte de la jurisdicción del Tribunal de distrito de Puerto Rico, Sala de Río Grande, ilegal, voluntaria, maliciosa y criminalmente resistió, obstruyó, demoró y estorbó a los Gdias. Oseas Torr[é]ns Castro y Raúl Maldonado Coreano, policías en el cumplimiento al tratar de cumplir la obligación de su cargo, ya que estos iban a intervenir con varios estudiantes, por estos alterar la paz a los aquí denunciantes." Íd., pág. 22.

actos "de indisciplina reñidos con los principios de moral y buen comportamiento" y contrarios a "los buenos modales que deben observar en su desarrollo para convertirse en ciudadanos responsables, amantes del orden y la paz, y cumplidores de sus deberes en la comunidad".(3)

Como es usual, la historia procesal del litigio presenta un cuadro un tanto más complicado. A raíz de la publicación de los artículos en controversia, el 22 de octubre de 1982, la Sra. Marta Villanueva instó demanda ante el Tribunal Superior de Puerto Rico, Sala de San Juan, contra tres miembros de la Policía de Puerto Rico, un ciudadano particular y El Vocero alegando, en el

---

(3) En su totalidad, el editorial leía como sigue:

*Un Mal Ejemplo*

"¿Hasta cuándo podrán soportarse las acciones irresponsables de algunos maestros y de individuos ajenos a los planteles de enseñanza, que inducen a los niños a cometer actos de indisciplina reñidos con los principios de moral y buen comportamiento?

"Nuestra comunidad está sumida en la más inconcebible incertidumbre y muchos compatriotas se resisten a creer que no es cierto lo que leen en la Prensa escrita y escuchan en la Prensa electrónica. En la edición del martes publicamos una noticia en la que la Policía informaba que la maestra Marta Villanueva, que ofrece sus servicios profesionales en la Escuela Intermedia "Josefina Quiñones" de Río Grande, fue acusada de interferir con la Policía y de Alteración a la Paz, por el Juez Luis A. Saavedra.

"La maestra Villanueva y otros compañeros suyos, llevaron a un grupo numeroso de estudiantes desde Río Grande hasta la Calle Loíza para protagonizar una protesta frente a las oficinas del Superintendente Escolar del Distrito de Río Grande. En el grupo que protestaba, había individuos ajenos a la escuela donde enseña la Sra. Villanueva. Entre ellos estaban los mocetones David Rodríguez Rodríguez, de 20 años e Higinio Cruz Varela, de 19, a quienes la maestra Villanueva, según lo informado por la Policía, incitó para que junto a cinco estudiantes, viraran unos drones y regaran la basura frente a las oficinas del Superintendente.

"Esa acción de los mozalbetes y los niños obligó a la Policía a intervenir, para evitar que siguieran violando la ley. En ese instante la maestra Villanueva interfirió con la Policía y a la vez alteró la paz. Los protestantes además habían interrumpido el libre tránsito, colocando vehículos de motor en medio de la carretera. Esta acción de los maestros y los estudiantes no estaba justificada a juzgar por la información suministrada por la Policía. Se explicó que la protesta obedecía a que la escuela superior "Pedro Falú" donde estudiaban los protestantes está siendo reparada debido a las malas condiciones en que se encuentra. Para que continuaran sus estudios fueron transferidos a la Escuela Intermedia "Josefina Quiñones".

"Si la escuela superior "Pedro Falú" se está reconstruyendo, ¿por qué se llevó a efecto la protesta? Los maestros no debieron haber inducido a los estudiantes a tales actos que están reñidos con los buenos modales que deben observar en su desarrollo para que se conviertan en ciudadanos responsables, amantes del orden y la paz y cumplidores de sus deberes en la comunidad. Este es un ejemplo poco edificante y los padres de los estudiantes deben protestar para que no conviertan a sus hijos en estorbos públicos." Apéndice, págs. 17–18.

caso de este último, que el diario había publicado una información libelosa sin haber cotejado la fuente oficial de información.(4) El 6 de diciembre de ese año, El Vocero presentó moción de sentencia sumaria basada en que la parte demandante no había alegado que éste hubiese actuado con malicia real al publicar la noticia y que, siendo la profesora Villanueva un funcionario público, la omisión era fatal para su reclamación.(5) A esta moción se opuso oportunamente la parte demandante, quedando la misma sometida para su resolución. El 28 de marzo de 1985, el tribunal de instancia se negó a desestimar la demanda instada por la señora Villanueva contra El Vocero, aduciendo como base para su determinación que la demandante no era un "funcionario público" y que, por lo tanto, sólo venía obligada a establecer que el periódico había sido negligente en la publicación de la noticia. Inconforme, el 17 de junio de 1985 El Vocero presentó ante este Tribunal una petición de *certiorari*. Declinamos ejercer nuestra jurisdicción "en aquella etapa de los procedimientos".

El 18 de noviembre de 1988, El Vocero presentó una *segunda* moción de sentencia sumaria ante el tribunal de instancia. *Basó su solicitud de desestimación, esta vez, en que la noticia publicada el día 11 de noviembre de 1981 no podía ser negligente ni accionable ya que constituía un "informe justo y verdadero" basado en un comunicado oficial del arresto de la demandante y que el editorial publicado el día 13 estaba protegido por el "privilegio del comentario imparcial".* La moción fue desestimada de plano por el tribunal de instancia por existir, al entender

---

(4) En cuanto a los demás codemandados la demanda alegaba, en síntesis y en lo pertinente, que los policías Oseas Torréns Castro y Raúl Maldonado Coreano la agredieron físicamente y radicaron cargos criminales no cometidos por ella; que el Coronel Catalino Hernández Class la calumnió públicamente sin constatar los hechos informados por los otros dos policías codemandados, y que el codemandado Rafael González Méndez conspiró en la persecución maliciosa de la demandante. La disposición que del caso hacemos en el día de hoy —a base de los principios de nuestra ley y jurisprudencia sobre libelo— es de aplicación, naturalmente, únicamente en cuanto a la demanda instada contra el peticionario El Vocero de Puerto Rico.

(5) Descansando un poco más de lo aconsejable en la esperanza que en la razón, señaló además el demandado en la alternativa que, aun asumiendo que la señora Villanueva no fuera un funcionario público bajo la doctrina de *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), el haber participado en la protesta pública la convertía en una figura pública por lo que le era de aplicación el requisito de la malicia real.

de dicho foro judicial, controversias de hecho que debían ser dilucidadas en una vista plenaria.(6) Nuevamente presentó El Vocero recurso de *certiorari* ante este Foro reproduciendo básicamente los mismos argumentos presentados ante el tribunal de instancia. Mediante resolución de fecha 8 de diciembre de 1988, una vez más declinamos ejercer nuestra jurisdicción. Ante una *fundamentada moción de reconsideración,* sin embargo, el 19 de enero de 1989 concedimos término a la parte demandante recurrida para que mostrara causa por la cual no debiéramos dejar sin efecto nuestra Resolución del 8 de diciembre de 1988 y expedir el auto de *certiorari* solicitado. Dicha parte compareció.

No habiéndose paralizado por este Tribunal los trámites a nivel de instancia, dicho foro entendió procedente señalar el caso para vista en su fondo. En dicho día no comparecieron ni la parte demandante ni el codemandado El Vocero. El tribunal de instancia dictó sentencia mediante la cual ordenó el archivo y sobreseimiento del caso "por falta de interés . . .". La parte demandante presentó, *en tiempo,* una moción de reconsideración, la cual —*inmediatamente que tuvo conocimiento de la misma*— acogió el foro de instancia, procediendo a dejar sin efecto la sentencia dictada.

## II

■ De entrada, y en vista del peculiar trámite acaecido a nivel de instancia en relación con la sentencia de archivo emitida por dicho foro mientras estaba pendiente el presente recurso —y la posterior reconsideración por el foro de instancia de la referida

---

(6) En su Resolución de 13 de diciembre de 1988, el ilustrado foro de instancia identificó las siguientes controversias de hecho como impedimento para que se pudiera dictar sentencia sumariamente:

"El Tribunal entiende que hay controversia fáctica sobre si la demandante es figura pública. Hay controversia fáctica sobre si El Vocero incurrió en malicia al publicar el artículo que genera el presente pleito. Hay controversia fáctica si lo publicado es falso. Hay controversia fáctica si hubo corroboración sobre los hechos que originan la noticia. Hay controversia fáctica si la [P]olicía al ofrecer la supuesta información actuó con negligencia. Hay controversia fáctica sobre quién ofreció la información al periódico y hay controversia fáctica sobre si la parte demandante ha sufrido daños y el monto de los mismos." Resolución, pág. 2.

sentencia— *examinamos la cuestión de si tenemos o no jurisdicción para resolver el presente recurso a base de la realidad fáctica que reflejan los autos y de nuestra ineludible misión de hacer cumplida justicia.* La Regla 47 de Procedimiento Civil, 32 L.P.R.A. Ap. III, gobierna la cuestión a decidir. La misma establece que:

> La parte adversamente afectada por una resolución, orden o sentencia podrá, dentro del término de quince (15) días desde la fecha de la notificación de la resolución u orden o desde la fecha del archivo en los autos de una copia de la notificación de la sentencia, presentar una moción de reconsideración de la resolución, orden o sentencia. *El tribunal dentro de los diez (10) días de haberse presentado dicha moción, deberá considerarla.* Si la *rechazare de plano,* el término para apelar o solicitar revisión se considerará como que nunca fue interrumpido. Si se tomare *alguna determinación* en su consideración, el término para apelar o solicitar revisión empezará a contarse desde la fecha en que se archiva en los autos una copia de la notificación de la resolución del tribunal resolviendo definitivamente la moción. *Si el tribunal dejare de tomar alguna acción con relación a la moción de reconsideración dentro de los diez (10) días de haber sido presentada, se entenderá que la misma ha sido rechazada de plano.*
>
> Cuando el término para recurrir de una sentencia fuere interrumpido en virtud de esta regla, la interrupción beneficiará a cualquier otra parte que se hallare en el pleito. (Énfasis suplido.)

En lo pertinente *al aspecto de la disposición* por el tribunal de la moción de reconsideración radicada, de una simple lectura de la transcrita Regla 47 de Procedimiento Civil resalta, en primer lugar, el *deber u obligación* que le impone dicha disposición reglamentaria al tribunal *de considerar* la misma. En segundo lugar, resulta claro que el tribunal, *una vez ha considerado y evaluado los méritos de la moción de reconsideración radicada,* tiene *tres* opciones respecto a la misma, a saber: (1) tomar, dentro del mencionado término de diez días, "alguna determinación" respecto a la referida moción —por ejemplo, señalar la misma para vista, concederle término a la otra parte para que se exprese, etc.— en cuya situación se entiende interrumpido el término de revisión; (2) declararla *expresamente* sin

lugar dentro del mencionado término de diez días, y (3) dejar *transcurrir* el término de diez días —lo que la mencionada Regla 47 de Procedimiento Civil califica como "rechazar de plano"— sin tomar acción alguna respecto a la moción radicada. En estas dos últimas situaciones, se considerará que el término de revisión nunca fue interrumpido.

■ Ahora bien, nadie debe tener duda alguna sobre el hecho de que la disposición sobre "rechazo de plano" que contiene la citada Regla 47 de Procedimiento Civil *necesariamente* tiene que ser considerada *conjuntamente* con el *deber u obligación* que la referida regla le impone al tribunal de *"considerar"* la moción de reconsideración que se radica. Ello así por razón de que para que se pueda entender que una persona ha "rechazado" algo, *tiene que por lo menos estar consciente de ello y conocerlo*. En otras palabras, *no se puede entender rechazado lo que se desconoce*.

■ La norma jurisprudencial a la que se refiere la opinión minoritaria emitida —esto es, que se entiende "rechazada de plano" por los tribunales de instancia una moción de reconsideración radicada al amparo de lo dispuesto por la citada Regla 47 de Procedimiento Civil si el tribunal no actúa sobre dicha moción "dentro de los diez días de haber sido presentada" la misma; que dicha situación no tiene el efecto de interrumpir el término de revisión, y que el tribunal de instancia no tiene facultad para considerarla una vez transcurrido dicho término sin haber tomado "alguna determinación" sobre la misma— no hay duda es correcta.

■ *Dicha norma jurisprudencial, sin embargo, parte de la premisa incuestionable que el tribunal de instancia —entiéndase el juez sentenciador— no sólo tenía conocimiento de la radicación de la moción de reconsideración sino que, en cumplimiento del deber u obligación que le impone la Regla 47 de Procedimiento Civil, ante, "consideró" el contenido de la misma, esto es, los fundamentos aducidos por la parte que la presentó. Esto es,* de ordinario y en virtud de la "presunción de regularidad" que

cobija los procedimientos judiciales, se "da por sentado" que el tribunal de instancia, dentro del término de diez días que dispone la Regla 47 de Procedimiento Civil, ante, *efectivamente consideró* la moción de reconsideración y decidió no actuar sobre la misma. Dicha presunción, naturalmente, está sujeta a prueba en contrario.

Ahí precisamente radica el *error* que comete la opinión minoritaria en el presente caso. Es cierto que, conforme se señala en la misma, el juez sentenciador actuó sobre la moción de reconsideración a los 86 días de haber sido radicada. *Sin embargo*, la minoría no considera un hecho que *radicalmente varía la aplicación del derecho en este caso*: debido a error y/o negligencia de la secretaría del tribunal de instancia, la moción de reconsideración que en tiempo había radicado la parte demandante *no fue llevada ante la consideración del magistrado* sino hasta 85 días después de su presentación; *esto es, el día antes en que éste precisamente reconsideró la sentencia que había dictado.* Así *específicamente* lo hizo constar el juez de instancia en la resolución que emitió reconsiderando la sentencia desestimatoria que había emitido.(7)

▪ Ese hecho, que se abstiene de expresar la minoría, impide que se aplique la disposición contenida en la Regla 47 de Procedimiento Civil, ante, y la norma jurisprudencial al efecto, sobre "rechazo de plano". *No* conociendo el juez sentenciador la existencia de la moción de reconsideración *ni* los fundamentos de la misma, *no se puede entender y resolver que la rechazó de plano en perjuicio de la parte que radicó en tiempo la referida moción.*

▪ Resolver, como pretende que se haga la minoría, que el *automático* transcurrir del término de los diez días —aun cuando

---

(7) La orden que, *con fecha de 23 de febrero de 1990*, emitiera el Hon. Juez William Fred Santiago relativa a la moción de reconsideración que radicara la parte demandante recurrida, literalmente lee:

"A la moción radicada el 13/12/89, *y tra[í]da a mi despacho el 22/2/90*, como se pide.

"Se deja sin efecto la sentencia dictada el 23/10/89 y reducida a escrito el 28/11/89." (Énfasis suplido.)

el tribunal sentenciador *desconozca* de la radicación de la moción de reconsideración y, por ende, de su contenido— priva de facultad al tribunal para actuar sobre la misma, *no sólo es erróneo sino que entraña la comisión de una grave injusticia.* En esencia, estaríamos penalizando a una parte litigante, *que cumplió con su deber y obligación de radicar la moción en la forma requerida por la Reglas de Procedimiento Civil,* por causa de la conducta negligente incurrida por funcionarios del propio tribunal. La mejor evidencia de dicha injusticia lo constituye el presente caso. Tan pronto como conoció el juez sentenciador de la existencia de la moción de reconsideración y tan pronto "consideró" la misma, la declaró con lugar.

▇▇▇▇ "Cuando de hacer justicia se trata, no puede haber moldes técnicos que aprisionen los remedios justos." *Sucn. Bravo v. Srio. de Hacienda,* 106 D.P.R. 672, 675 (1978). Véase *Rodríguez v. Tribl. Mpal. y Ramos,* 74 D.P.R. 656, 667 (1953). El propósito y fin que entraña ese profundo pensamiento jurídico, *el de hacer cumplida justicia,* es el derrotero que siempre ha seguido este Tribunal.

▇▇▇▇ Evidencia de ese proceder lo constituyen las decisiones que este Tribunal emitiera en *Figueroa Rivera v. Tribunal Superior,* 85 D.P.R. 82 (1962), y en *Vda. de Carmona v. Carmona,* 93 D.P.R. 140 (1966). En las mismas resolvimos que no podíamos privar a un ciudadano del derecho a revisar unas sentencias emitidas por los foros de instancia en situaciones en que la fecha en que se deposita en el correo la notificación de sentencia es una realizada *pasado el término de revisión,* calculado el mismo a base de la fecha de archivo en autos, o *tan tardíamente* que la parte afectada por la sentencia dictada no tiene tiempo suficiente para preparar adecuadamente un recurso de revisión. Dadas esas circunstancias, en las cuales obviamente medió error o negligencia de parte de los funcionarios del tribunal de instancia, *rechazamos* la posición del *transcurso automático* del *término jurisdiccional* para acudir ante este Tribunal en revisión de una sentencia emitida por el foro de instancia. *Dichas decisiones*

*tuvieron, y tienen, el loable propósito de flexibilizar una norma férrea y así evitar que en nombre de la misma se ;cometa la injusticia de impedir que una parte sea despojada de su derecho a revisar una sentencia errónea debido a una actuación negligente de la Secretaría del tribunal de instancia.*

Si en las decisiones antes mencionadas —en vista de la negligencia en que incurrieron los funcionarios del tribunal en la notificación de las sentencias— *nos negamos* a aplicar inflexible y automáticamente el *término jurisdiccional* para acudir en revisión ante este Tribunal *y resolvimos* que no se podía entender que dicho término había transcurrido, *¿por qué no podemos aplicar la misma norma, y razonamiento, en el presente caso donde debido a una negligencia similar el tribunal de instancia no advino en conocimiento a tiempo de la radicación de la moción de reconsideración?*

La contestación, no hay duda, resulta ser obvia: *no existe razón legal válida alguna para no resolver la situación planteada en forma parecida.* Habiendo cumplido la parte demandante con lo requerido por la citada Regla 47 de Procedimiento Civil, al radicar en tiempo la moción de reconsideración, el tribunal venía en la *obligación* de cumplir con el *deber* que le impone la Regla 47 de Procedimiento Civil, ante, de *"considerar"* la moción radicada *en algún momento dentro del término de diez días especificado en dicha Regla 47.* No habiendo así ocurrido en el presente caso debido a error o negligencia de los funcionarios del tribunal de instancia —*hecho acreditado por el propio juez sentenciador en la orden que éste emitiera, lo cual tiene el efecto de destruir la presunción de regularidad que cobija a los procedimientos judiciales*— el mencionado término de diez días, desde un punto de vista jurídico, *"nunca transcurrió".* Vda. de Carmona v. Carmona, ante. Es debido a ello que el juez sentenciador *tenía facultad en ley para reconsiderar, en el momento que*

*lo hizo, la sentencia desestimatoria que anteriormente había emitido.* [8]

 Rechazamos, por erróneo, el argumento que aduce la minoría a los efectos de que, como consecuencia de lo aquí decidido, las partes en un caso "nunca estarán seguras de que el término para recurrir en alzada ha comenzado a transcurrir". Opinión disidente, pág. 665. Resulta procedente que se enfatice que el hecho de si los tribunales de instancia —en cumplimiento de las disposiciones de la citada Regla 47 de Procedimiento Civil— efectivamente "han considerado o no" las mociones de reconsideración que ante dichos foros radican las partes *es uno de fácil comprobación.* Ello así por razón de que en las secretarías de los tribunales de instancia *se mantiene récord, o constancia, demostrativo no sólo de las diferentes mociones que se radican en cada caso sino que de la fecha exacta en que dichos escritos son llevados ante la consideración del juez a cargo del caso.* En consecuencia, todo lo que de una parte se requiere que realice —con el propósito de conocer si la moción de reconsideración que

---

[8] *A pesar de que entendemos que la moción de reconsideración radicada pudo, adicionalmente, ser correctamente considerada por el juez sentenciador como una moción radicada al amparo de la Regla 49.2 de las Reglas de Procedimiento Civil de 1979* (32 L.P.R.A. Ap. III), *dados los fundamentos antes aducidos, somos del criterio que resulta innecesario extendernos sobre este fundamento adicional.* A esos efectos véase *Sucn. Bravo v. Srio. de Hacienda,* 106 D.P.R. 672 (1978).

De todas maneras, ya fuera la actuación del tribunal de instancia una correcta o incorrecta, lo cierto es que la situación procesal, *real y actual,* a nivel de instancia *es que la demanda radicada por la parte demandante está vigente y pendiente ante dicho foro.* Sobre ello, nadie debería de tener la menor duda. Dicha posición resulta ser inescapable y mandatoria en vista de la norma a los efectos de que se presume la corrección y regularidad de los procedimientos y decisiones que llevan a cabo y emiten los tribunales de instancia y de que ninguna de las partes revisó la actuación, vía *certiorari,* del foro de instancia dejando sin efecto la sentencia de archivo y reinstalando el caso.

Ante esta situación procesal incontrovertida, se expresa en la opinión minoritaria —motu proprio, en violación del principio de que nuestro derecho es uno rogado— que, por razón de que el foro de instancia supuestamente actuó sin jurisdicción al amparo de la citada Regla 47 de Procedimiento Civil, 32 L.P.R.A. Ap. III, el pleito radicado por la parte demandante "concluyó con la sentencia del 28 de noviembre de 1989 que archivaba la demanda por falta de interés". En apoyo de lo antes expresado se pretende utilizar, *como vehículo procesal decisorio adecuado,* un recurso de *certiorari* —el cual fue radicado con el propósito de revisar una resolución denegatoria de una solicitud de sentencia sumaria— para decretar que el tribunal de instancia cometió error revocable de derecho al dejar sin efecto una sentencia de archivo dictada por dicho foro. *Ello, a nuestro juicio, es un curso procesal sumamente objetable y erróneo.*

oportunamente radicara ha sido "considerada" por el juez senten-
ciador dentro del término de diez días de haber sido radicada la
misma y, por consiguiente, si la misma fue o no "rechazada de
plano"— *es una simple y sencilla gestión a esos efectos en la
secretaría del tribunal.*

Por otro lado, y con el aparente, y obvio, propósito de intentar
justificar su posición, la minoría expresa que el resultado del curso
decisorio que propone es igual al solicitado en la petición de
*certiorari* de *El Vocero*: la desestimación de la acción incoada
contra ellos. Si bien ello es correcto estamos seguros que a El
Vocero —como representante en este pleito de una prensa activa,
vigorosa, informada y libre— *no le interesa prevalecer en la
forma propuesta en la opinión minoritaria.*

Somos del criterio que dicho rotativo —como todos los demás
existentes en Puerto Rico— prefiere que este Tribunal, sin
titubeos, resuelva si debe adoptar las doctrinas jurisprudenciales
que propulsa en el presente caso en representación de la prensa
puertorriqueña en general. *Establecido el hecho de que efectiva-
mente tenemos jurisdicción para entender en el recurso radicado
por el peticionario El Vocero, discutimos los méritos del mismo.*

### III

Tres son las controversias que se presentan para nues-
tra consideración.(9) En primer lugar, debemos determinar si
estuvo justificado el tribunal de instancia al negarse a entender en

(9) Una posible cuarta controversia gira en torno a si la señora Villanueva, maestra
de una escuela pública en el pueblo de Río Grande, debe considerarse como un "funcionario
o figura pública" al momento de dictar sentencia sumaria. Como vimos, al resolver el
tribunal de instancia la primera moción de sentencia sumaria, dicho foro determinó que la
profesora Villanueva *no* era un "funcionario o figura pública", rechazando de ese modo la
contención del codemandado peticionario El Vocero a los efectos de que la demandante
venía en la obligación de alegar, y probar, la existencia de malicia real por parte del citado
periódico.

Como es sabido, en *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1985), este Tribunal
mayoritariamente resolvió que un policía era un "funcionario público" para efectos de la
doctrina establecida por el Tribunal Supremo federal en *New York Times Co. v. Sullivan*,
ante.

Ciertamente, en el espectro de los funcionarios y figuras públicas, una maestra de
escuela pública parece ocupar un lugar igual, o mayor, que un agente del orden público.

640

la segunda moción de sentencia sumaria radicada por el codemandado El Vocero, basada dicha negativa en la supuesta existencia de múltiples controversias de hecho que impedían que se dictara sentencia en esa etapa del litigio. En segundo lugar, consideraremos si la noticia publicada por El Vocero el día 11 de noviembre de 1981 está protegida por el "privilegio del reporte justo y verdadero" y, por último, si al editorial publicado dos días más tarde le cobija la "defensa del comentario imparcial".

Comenzamos con una breve incursión en el derecho de daños y perjuicios referente a las acciones por libelo y calumnia y la procedencia en las mismas del mecanismo de la sentencia sumaria.

A. La protección contra expresiones difamatorias o libelosas en nuestra jurisdicción surge de dos preceptos constitucionales y uno estatutario. Los preceptos constitucionales los encontramos en el Art. II, Secs. 4 y 8 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. La Sec. 4 dispone que "[n]o se aprobará ley alguna que restrinja la libertad de palabra o de prensa . . .". Const. E.L.A., *supra*, ed. 1982, pág. 265. Por su parte, la Sec. 8 establece que "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Íd., pág. 292. Véanse: *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 690–691 (1984); *Cortés Portalatín v. Hau Colón*, 103 D.P.R. 734, 738 (1975).[10] El precepto estatutario lo es la Ley de 19 de febrero de 1902, Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3141 *et seq.*, la cual estableció en Puerto Rico desde principios de siglo una acción en daños y

En vista del resultado a que llegamos, sin embargo, se hace innecesario contestar dicha interrogante.

[10] En el Informe de la Comisión de la Carta de Derechos a la Convención Constituyente de Puerto Rico se expresa que "[e]sta sección [4] corresponde a las restantes disposiciones de la enmienda primera en la Constitución federal e incorpora a nuestra Constitución todo el derecho históricamente establecido con relación a la libertad de palabra, de prensa, de reunión y de petición. Las secciones 3 y 4 cubren el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos". 4 Diario de Sesiones de la Convención Constituyente 2564 (1951).

perjuicios por libelo y calumnia.[11] La vigencia de nuestra Ley de Libelo y Calumnia está condicionada, naturalmente, a que su aplicación no sea incompatible con las antes citadas disposiciones de nuestra Constitución, *Clavell v. El Vocero de P.R.*, ante, pág. 738; *Cortés Portalatin v. Hau Colón*, ante, pág. 690; *García Cruz v. El Mundo Inc.*, 108 D.P.R. 174, 180 (1978), ni con las interpretaciones judiciales[12] que sobre la Primera Enmienda a la Constitución de los Estados Unidos tenga a bien hacer el Tribunal Supremo nacional. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–349 (1974).[13]

---

[11] La Sec. 2 de nuestra Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3142, dispone:

"Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar a los parientes y amigos sobrevivientes."

[12] En las últimas dos décadas, el área del derecho relacionada con las acciones en daños y perjuicios ocasionadas por libelo y calumnia —área tradicionalmente delegada a los respectivos estados para su regulación— ha sido modificada sustancialmente por el Tribunal Supremo de los Estados Unidos, quien se ha dado a la tarea de interpretar la Primera Enmienda a la Constitución federal. Véanse: Becker, *Structuring Defamation Law to Eliminate the Fact-Opinion Determination: A Critique of Ollman v. Evans,* 71 Iowa L. Rev. 913 (1986); K. Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report,* 54 N.Y.U. L. Rev. 469, 475 (1979); Comentario, *Constitutional Privilege to Republish Defamation,* 77 (Núms. 5–8) Colum. L. Rev. 1266 (1977); Nota, *The Developing Privilege of Neutral Reportage,* 69 Va. L. Rev. 853 (1983); L. Eldredge, *The Law of Defamation,* Indianapolis, The Bobbs-Merill Co., 1978, pág. 245; *Justice Black and First Amendment "Absolutes", A Public Interview,* 37 N.Y.U. L. Rev. 549, 557–558 (1962). Como se sabe, Puerto Rico puede legislar en el área de responsabilidad por difamación siempre y cuando no se imponga responsabilidad absoluta, en los casos de personas privadas, *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 422 (1977), o, en los casos de funcionarios o figuras públicas, que las reglas que se establezcan no afecten el contenido mínimo que le ha dado el Tribunal Supremo federal a la Primera Enmienda de su Constitución. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–349 (1974); *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 690 (1984).

[13] Estos elementos, aun cuando no han derogado nuestra Ley de Libelo y Calumnia en su totalidad, sí han tenido el efecto de modificarla significativamente. A manera de ejemplo, mencionamos que doctrinas que fueron desarrolladas al amparo de la citada ley, tales como las doctrinas de la presunción de malicia, la responsabilidad sin falta y la presunción de daños, carecen de vigencia en nuestros días. *Torres Silva v. El Mundo, Inc.*, ante, pág. 423. Así mismo, distinciones que se establecían a base de publicaciones que podían constituir libelo *per se* y aquellas que constituían libelo *per quod, Bosch v. Editorial El Imparcial, Inc.*, 87 D.P.R. 285, 300 (1963), han sufrido un tratamiento similar. Véanse, en general: 32 L.P.R.A. secs. 3142 y 3145; *Pueblo v. Prensa Insular,* 69 D.P.R. 683 (1949); *Rivera v. Martínez,* 26 D.P.R. 760 (1918); *Díaz v. P.R. Ry., Lt. & P. Co.,* 63 D.P.R. 808, 812

Recientemente, en *Maldonado y Negrón v. Marrero y Blanco*, 121 D.P.R. 705 (1988), y en *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37 (1988), tuvimos la oportunidad de examinar los elementos que deben ser satisfechos en nuestro ordenamiento jurídico para que se configure una causa de acción por difamación. El demandante en un caso de libelo debe probar, en primer lugar, que la información publicada *es falsa* y que por causa de su publicación sufrió *daños reales*. (14) *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 427 (1977). Aun siendo falsa la información, (15) sin embargo, no hay derecho a ser indemnizado a menos que se pruebe, en el caso de una persona privada, que la imputación fue hecha negligentemente, *Oliveras v. Paniagua Diez*, 115 D.P.R. 257 (1984), según este concepto es entendido en el campo del derecho de daños y perjuicios. (16) En los casos en que estén envueltos funcionarios o figuras públicas, por otro lado, el demandante debe probar, además, que la información fue publicada con malicia real, o lo que es lo mismo, a sabiendas de que era falsa o con grave menosprecio de si era falsa o no. *Soc. de*

(1944). A partir de 1964, *New York Times Co. v. Sullivan*, ante, doctrinas como éstas que nacieron para proteger los medios de comunicación han quedado superadas por una protección constitucional más amplia desarrollada al amparo de los derechos de libertad de expresión y de prensa y a expensas del derecho a la intimidad. Véanse, tambíen: *Gertz v. Robert Welch, Inc.*, ante; *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975). Ello, sin embargo, no debe constituir impedimento para que nos esforzemos por darle efecto a las disposiciones de nuestra Ley de Libelo y Calumnia que aún tienen vigencia, teniendo en mente el ideal de lograr un derecho propio o netamente puertorriqueño más atento a nuestras necesidades y aspiraciones.

(14) El hecho de que la información publicada sea cierta es, pues, una defensa válida que tiene disponible todo demandado en un caso de libelo.

(15) En *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432, 436 (1977), afirmamos en el contexto de una acción de libelo contra un funcionario público que "la libertad de prensa incluye tanto la manifestación veraz como la incorrecta", ya que "[e]l propósito de la garantía constitucional es mantener un clima abierto para la discusión franca y vigorosa de los asuntos de interés público y de la conducta y ejecutoria de los funcionarios públicos".

(16) Los criterios para la determinación de negligencia en las acciones por libelo fueron expuestos en *Torres Silva v. El Mundo, Inc.*, ante. Debe considerarse:

(1) La naturaleza de la información publicada, la importancia del asunto que trata y especialmente si ésta es difamatoria de su propia faz y puede preverse el riesgo de daños.

(2) Origen de la información y confiabilidad de su fuente.

(3) Razonabilidad del cotejo de la veracidad de la información tomando en consideración el costo en términos de dinero, tiempo, personal, urgencia de la publicación, carácter de la noticia y cualquier otro factor pertinente.

*Gananciales v. López,* 116 D.P.R. 112, 115 (1985); *Torres Silva v. El Mundo, Inc.,* ante, pág. 421. La malicia real no puede presumirse, por lo que es imprescindible que el demandado abrigue serias dudas sobre la certeza de la publicación y que ésto sea objeto de prueba clara y convincente. *García Cruz v. El Mundo Inc.,* ante, págs. 180–181. Véase, en general, *New York Times Co. v. Sullivan,* ante.

 B. La jurisprudencia arriba reseñada nos revela que el derecho sustantivo aplicable a las acciones de libelo está altamente condicionado por las decisiones que sobre el derecho a la libertad de prensa hayan emitido tanto el Tribunal Supremo de los Estados Unidos como este Tribunal. La influencia ejercida por esta libertad fundamental, sin embargo, no termina ahí. Como es de esperarse, *el derecho a la libertad de prensa y expresión, inclusive, ha ocasionado que sean un tanto distintas las normas que debemos aplicar al momento de considerar en casos de libelo una moción de sentencia sumaria.* Veamos.

 En el marco de nuestra jurisprudencia sobre libelo, hemos expresado que "'aunque los tribunales vacilan en dictar sentencias sumarias . . . aun así [se ha] exigido a menudo una observancia más estricta de las disposiciones de la Regla [36] cuando la acción envuelve los derechos de expresión de un demandado, ya que la prolongación de estos pleitos tiene un impacto disuasivo sobre el ejercicio de tales derechos'". *García Cruz v. El Mundo, Inc.,* ante, pág. 182. Punto seguido afirmamos que "el procedimiento de sentencia sumaria es 'una parte integral de la protección constitucional disponible a los demandados' en esta índole de litigio". Íd. Es evidente, por lo tanto, que en los casos de libelo la etapa de la sentencia sumaria es una etapa crítica de los procedimientos.

 Quizás más importante, los factores a evaluarse al momento de dictarse sentencia sumaria también son distintos. La Regla 36.3 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) dispone, para todos los casos civiles, que se dictará sentencia

644

sumaria "inmediatamente si las alegaciones, disposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostraren que no hay controversia *real sustancial* en cuanto a ningún hecho *material* . . .". (Énfasis suplido.) En los casos de libelo, en que están envueltos "figuras o funcionarios públicos", la labor del tribunal se ha delineado de la siguiente manera: "[A] menos que el tribunal determine, a base de declaraciones juradas, deposiciones u otra prueba documental, que la parte demandante puede probar la existencia de malicia real, en el sentido que se emplea el término en *New York Times* [*Co. v. Sullivan*, ante], debe dictarse sentencia a favor de la parte demandada." *García Cruz v. El Mundo, Inc.*, ante, pág. 182. En otras palabras, *el demandante tiene el deber de producir prueba, en la etapa de la sentencia sumaria, sobre hechos materiales respecto a los cuales no exista controversia real sustancial y que, de ser probados en un juicio plenario, establecerían la existencia de malicia real por parte del periódico en la publicación de la noticia libelosa.*

De la misma manera, aun cuando nuestra jurisprudencia anterior no lo haya indicado, *en los casos de personas privadas, éstos cuentan con una carga similar de prueba*; la diferencia estriba en el hecho de que, debido a que no se han lanzado voluntariamente a "la palestra pública", *Torres Silva v. El Mundo, Inc.*, ante, pág. 422, *las "personas privadas" sólo vendrán obligadas a demostrar que cuentan con prueba suficiente para establecer que medió negligencia por parte del periódico en la publicación de la noticia difamatoria.* Ello debe ser así por cuanto, si *el fundamento* que justifica el establecimiento de unas normas más rigurosas para derrotar una moción de sentencia sumaria en casos de libelo *lo es el impacto disuasivo que sobre los derechos de primera enmienda* pueda tener la prolongación de estos pleitos, *es natural que la misma se establezca tanto en los casos de figuras públicas como de personas privadas.* Ya habíamos resuelto, además, que el asunto de la suficiencia de la prueba para establecer la existencia de malicia real, *y en adelante de la*

*negligencia en los casos en que estén envueltas personas priva-das*, plantea una cuestión estrictamente de derecho. *García Cruz v. El Mundo, Inc.*, ante, pág. 182; *New York Times Co. v. Sullivan*, ante, págs. 283–292.

En el caso de autos, el tribunal de instancia fundó su negativa a dictar sentencia sumaria en la existencia de varias controversias de hecho que a su juicio requerían ser dilucidadas en una vista plenaria. Un vistazo a las alegadas controversias de hecho,[17] sin embargo, revela que las mismas *no* eran controversias reales sustanciales que recayeran sobre hechos materiales y que pudieran haber impedido que el tribunal dictara sentencia sumariamente. Aun aceptando que existiera controversia en torno a estos hechos secundarios, *lo cierto es que sobre el hecho realmente pertinente no existía controversia alguna*: la noticia publicada el día 11 de noviembre *prácticamente era una copia fiel y exacta del texto de las denuncias* radicadas por la Policía de Puerto Rico contra la demandante ante el Tribunal de Distrito de Río Grande.[18] Bajo las circunstancias particulares de este caso, una vez establecida la veracidad de este hecho, resulta ser realmente impertinente, *desde el punto de vista de la responsa-bilidad del periódico*, "si la Policía al ofrecer la supuesta informa-ción actuó con negligencia", o si fue una u otra la persona "quien ofreció la información al periódico", o "si hubo corroboración sobre los hechos que originan la noticia", o inclusive "si lo publicado [era] falso".[19] *Demostrado, a satisfacción del tribu-nal, que la noticia publicada por el periódico está basada en y corresponde en su totalidad a los hechos expuestos en una denuncia (un documento público y oficial), debe concluirse que bajo ningún conjunto de hechos que hubiera presentado la parte*

---

[17] Véase la nota al calce 6 de esta opinión.

[18] Véanse las notas al calce 1 y 2 de esta opinión.

[19] Véase la Resolución del tribunal de instancia de 13 de diciembre de 1988 citada en la nota al calce 6 de esta opinión. Nótese, además, que las primeras dos supuestas controversias de hecho citadas por el tribunal de instancia son, en realidad, controversias de derecho, *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 182 (1978), y que la determinación del monto de los daños debe ser impertinente al momento de determinar la responsabilidad legal, si alguna, del demandado.

*demandante se hubiera podido establecer que el periódico fue
negligente en la publicación de la noticia.* El hecho de que la
noticia fuera prácticamente una copia de la información vertida en
la denuncia demuestra, en todo caso, que el periódico había sido
diligente y responsable en su investigación y tratamiento del
asunto. Siendo prácticamente imposible para la parte demandante
cumplir con su obligación, según lo hemos expuesto anterior-
mente, de producir prueba sobre negligencia en esta etapa de los
procedimientos, no existía razón alguna para que no se dictara
sentencia sumaria desestimando la reclamación incoada en contra
de El Vocero.

▪ Concluimos, pues, que incurrió en error el tribunal de
instancia al negarse a dictar sentencia sumaria a favor de la parte
demandada debido a que la demandante no podía demostrar que
contaba con evidencia para probar tan siquiera que el demandado
había sido negligente al publicar la noticia alegadamente difama-
toria.

C. De la misma manera que "son muchos los caminos que
conducen a Roma", en el caso de autos varios son los fundamentos
por los cuales procede que se dicte sentencia sumaria a favor del
codemandado El Vocero de Puerto Rico, desestimando de esa
forma la reclamación incoada en su contra. Como hemos visto, El
Vocero basó su presente petición de *certiorari* exclusivamente en
su contención de que la noticia publicada el día 11 de noviembre
estaba protegida por el "privilegio del reporte justo y verdadero",
y, además, que el editorial del día 13 estaba igualmente protegido
por el privilegio de la "defensa del comentario imparcial". *Ello nos
brinda la oportunidad de aclarar los conceptos relativos a cada
una de estas dos doctrinas.* Pasemos a examinarlas.

▪ En términos generales, hemos señalado que "[u]na
comunicación privilegiada es aquella que, a no ser por la ocasión
o las circunstancias sería difamatoria y sujeta a reclamación".
*Díaz v. P.R. Ry., Lt. & P. Co.,* 63 D.P.R. 808, 811 (1944). Nuestro
estatuto de libelo y calumnia, siguiendo el derecho común anglo-
sajón, estableció diversos tipos de comunicaciones privilegiadas,

algunas de las cuales eran absolutas y otras solamente condicionales o restringidas. Íd., pág. 811. Véase la Sec. 4 de la Ley de Libelo y Calumnia, 32 L.P.R.A. sec. 3144, que dispone:

> No se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. *No se presumirá que es maliciosa la publicación que se hace*:
> Primero: En el propio desempeño de un cargo oficial;
> Segundo: *En un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos*;
> Tercero: A un funcionario oficial, apoyada en causa probable, con la intención de servir al procomún, o de conseguir remedio a un perjuicio hecho a un particular. (Énfasis suplido.)

Como podemos notar, son dos los requisitos que es necesario estén presentes para que se pueda configurar el "privilegio del reporte justo y verdadero". En primer lugar, el reporte tiene que ser justo en relación con el proceso que es objeto de información. *Mi Gi, Inc. v. Garnelt Massachussetts Broadcasters, Inc.*, 519 N.E.2d 283 (1988). El reporte es justo si éste captura substancia de lo acontecido y si toma en consideración el probable efecto que tendrá en la mente de un lector y oyente promedio. *Murray v. Bailey*, 613 F. Supp. 1276 (1985). El segundo elemento del privilegio consiste en que lo publicado tiene que ser cierto; ello desde el punto de vista de que —aun cuando la información que se brinda en el procedimiento judicial, legislativo u oficial sea inherentemente falsa o libelosa— el reportaje o noticia publicada es "cierta" por cuanto refleja la verdad de lo expresado o acontecido en el procedimiento llevado a cabo. *Caraballo v. P.R. Ilustrado, Inc.*, 70 D.P.R. 283 (1949). Para que se cumpla con el elemento de la veracidad de lo relatado no es necesario que lo publicado sea exactamente "correcto", sino que bastará con que se publique un estracto sustancialmente correcto de lo ocurrido. R. Smolla, *Law of Defamation*, Nueva York, Clark Boardman, 1986, págs. 8–37; *Schuster v. U.S. News & World Report, Inc.*, 459 F. Supp. 973 (D. Minn. 1978), confirmado en 602 F.2d 850 (8vo Cir.

1979); *Hopkins v. Keith*, 348 So. 2d 999 (1977); *Holy Spirit Ass'n, Etc. v. New York Times Co.*, 399 N.E.2d 1185, 1187 (1979).

 Surge con meridiana claridad, pues, que el "privilegio del reporte justo y verdadero", existente en nuestro ordenamiento desde principios de siglo, *protege inclusive a quien publica una información falsa o difamatoria, siempre que la misma recoja o refleje verazmente lo acontecido en los procedimientos, informes o acciones públicas u oficiales de agencias gubernamentales.* [20] El fundamento general detrás del mismo lo reconocimos en *Caraballo v. P.R. Ilustrado, Inc.*, ante, págs. 288–289. Allí expresamos, citando con aprobación a *Cowley v. Pulsifer*, 137 Mass. 392, 50 A.M. Rep. 318, que éste surge por cuanto "'es preferible que las causas se ventilen ante los ojos públicos, no porque las controversias que existan entre un ciudadano y otro sean de interés público, sino porque es de suma importancia que aquellos que administran la justicia estén siempre conscientes de su responsabilidad hacia el público, y que todo ciudadano se convenza por sus propios ojos de la forma en que se da cumplimiento a un deber público'". [21] *Dicho de otro modo, lo que se persigue es que el reportero actúe como sustituto del público en la observación del evento.* [22]

 Si bien es correcto que el privilegio existe cuando concurren las circunstancias arriba señaladas, no menos cierto es el hecho de que el mismo "se pierde" en caso de que se escriba una

---

[20] Se reconoce que los reportes realizados en torno a eventos delictivos están protegidos por el privilegio en vista del interés público que existe en la debida administración de la justicia. *Peisner v. Detroit Free Press, Inc.*, 266 N.W.2d 693, 697–698 (1978); *Minton v. Thompson Newspapers, Inc.*, 333 S.E.2d 913 (1985); *Koren v. Capital-Gazette Newspapers*, 325 A.2d 140, *cert.* denegado, 173 Md. 721 (1974).

[21] De igual modo se ha expresado el Tribunal Supremo de los Estados Unidos. Véase, por ejemplo, *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), y *Cox Broadcasting Corp. v. Cohn*, ante.

[22] En *Médico v. Time, Inc.*, 643 F.2d 134, *cert.* denegado, 454 U.S. 886 (1981), se justificó el privilegio aludiendo a que:

". . .the press acts as an agent, a 'public eye' to report to its reader, watchers, and listeners what they otherwise would have observed for themselves; that it enables the public to be informed as to the performance of public officials and institutions; and that it is in the public interest for it to learn about 'important' matters."

parte parcializada y subjetiva de la historia. Véanse, por ejemplo: *Hogan v. New York Times Company*, 313 F.2d 354 (2do Cir. 1963); *Bock v. Plainfield Courier-News*, 132 A.2d 523 (1957). Lo mismo ocurre si el demandante logra probar que el demandado publicó la información actuando maliciosamente, con ánimo prevenido, con el propósito de causar daño —véanse: *Lulay v. Peoria Journal Star*, 214 N.E.2d 746 (1966); *Schiavone Const. Co. v. Time, Inc.*, 735 F.2d 94 (3er Cir. 1984); *D'Alfonso v. A.S. Abell Co.*, 10 Med. L. Rep. 1663 (D. Md. 1984), confirmado en 765 F.2d 138 (4to Cir. 1985); *Pearce v. Courier–Journal*, 683 S.W.2d 633 (Ky. App. 1985)— o conociendo la falsedad de la información. Véase *Koren v. Capital-Gazette Newspapers*, 325 A.2d 140 (1974). En este último caso, claro está, no existe el privilegio ya que no se cumple con uno de sus dos requisitos: el de la veracidad de lo ocurrido.(23) Réstanos enfatizar el hecho de que se ha dicho que este privilegio constituye *la protección más importante* que se ofrece a la prensa en materia de libelo. K. Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report*, 54 N.Y.U. L. Rev. 469, 471–472 (1979).

Expuesto el derecho, *no es necesario que nos extendamos mucho para concluir que la noticia publicada el día 11 de noviembre de 1981 por el Vocero está protegida por el "privilegio del reporte justo y verdadero"*. Ambos requisitos claramente están presentes. En primer lugar, la noticia publicada *fue justa* en relación con los sucesos que fueron objeto de información. Ésta *capturó básicamente la sustancia* de lo acontecido, *limitándose a*

---

(23) En algunas jurisdicciones, una vez se ha cumplido el examen de lo que constituye lo justo y verdadero, se considera que el privilegio cierra las puertas y no se examinan los motivos, si algunos, que pudo tener el publicador ni tampoco su actitud hacia la veracidad de la declaración. Véase *Gurda v. Orange Cty. Publications Divisions, Etc.*, 439 N.Y.S.2d 417 (1981), revocado por otros motivos en 436 N.E.2d 1326 (1982). En otras, el privilegio puede ser levantado sólo cuando las declaraciones difamatorias están basadas claramente en informes oficiales y no se extienden a declaraciones que el lector pueda entender provienen de otras fuentes. *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (1985), *cert.* denegado, 106 S. Ct. 2247 (1986); *Levine v. CMP Publications, Inc.*, 738 F.2d 660 (1984). Aun en otras, el privilegio cubre los reportes y anuncios oficiales realizados por oficiales públicos en su capacidad como tal, *Doss v. Field Enterprises, Inc.*, 332 N.E.2d 497 (1975), mas no las publicaciones derivadas de declaraciones no oficiales, *Kirby v. Pittsburgh Courier Pub., Co.*, 150 F.2d 480, 482 (1945); *Médico v. Time, Inc.*, ante.

*hacer un recuento de los hechos* según le fueron informados al periódico por la Policía, y tomó en consideración el efecto que podía tener en la mente de un lector promedio, informando la misma en un tono sereno y profesional y evitando caer en un estilo crudo o sensacionalista.(24) En segundo lugar, no debe haber duda de que *lo relatado constituía un estracto sustancialmente correcto de lo ocurrido.* La mayoría de los hechos relatados *constaban en las denuncias radicadas* por la Policía, y los demás, presuntamente provenientes de la investigación realizada por el reportero, *no* han sido controvertidos por la parte demandante en momento alguno de este proceso. Por último, también debe quedar claro que no estamos ante las excepciones al privilegio reconocidas por la jurisprudencia. La noticia publicada claramente no constituía una opinión parcializada o subjetiva de los acontecimientos del día 11 de noviembre y nada en el récord sugiere que el demandado publicó la información actuando maliciosamente, con ánimo prevenido, o con el propósito de causar daño. *En vista de todo ello, no podemos más que concluir que la noticia del 11 de noviembre de 1981 publicada en el periódico demandado constituía un "reporte justo y verdadero", y, por lo tanto, privilegiado.*

▮ D. La única oportunidad que este Tribunal ha tenido para expresarse en torno a la "defensa del comentario imparcial" fue en *Bosch v. Editorial El Imparcial, Inc.,* 87 D.P.R. 285, 306–313 (1963). En aquella ocasión enfatizamos el hecho de que el *privilegio* del comentario imparcial y la *defensa* del comentario imparcial *son dos conceptos totalmente distintos que no debemos confundir.* Así, citando con aprobación el caso *O'Regan v. Schermerhorn,* 50 A.2d 10 (N.J. 1946), expresamos:

"Preliminarmente debe notarse que la defensa de comentario imparcial y bona fide con respecto a la crítica de asuntos de interés público y la defensa de privilegio no son idénticas —son separadas y distintas. En este último caso, las palabras pueden ser difamato-

---

(24) Nótese que inclusive se evitó reproducir las palabras obscenas que alegadamente profirió la señora Villanueva y que constaban en la denuncia.

rias, pero la difamación es permisible, por razón de la ocasión especial, basado en la política pública, pero en el caso anterior, el comentario y crítica no están privilegiados por razón de la ocasión en un sentido estrictamente legal. Lo que realmente se quiere decir es que tal comentario y crítica, si es imparcial, hecho de buena fe y basado en hechos, no constituye una difamación del demandante y por lo tanto no es libeloso —la censura o crítica no es sobre la persona en sí, sino sobre su obra." *Bosch v. Editorial El Imparcial, Inc.*, ante, pág. 308.

Debe mantenerse presente, en adición, que la "defensa del comentario imparcial" difiere de los privilegios en que "puede invocarse por cualquier individuo, periódico o revista y puede usarse siempre y cuando el comentario esté basado en hechos de interés público". *Bosch v. Editorial El Imparcial, Inc.*, ante, págs. 307–308. Siendo los privilegios materia de creación estatutaria en nuestro ordenamiento, véanse: *Bosch v. Editorial El Imparcial, Inc.*, ante, pág. 307; *Díaz v. P.R. Ry., Lt. & P. Co.*, ante. Somos del criterio que debemos declinar la invitación de adoptar jurisprudencialmente el privilegio del comentario imparcial para Puerto Rico, *optando, sin embargo, por reconocerle validez a su modalidad como defensa*.(25) La misma proviene, después de todo, "del derecho constitucional de libertad de palabra y de prensa limitado por el derecho de toda persona a protección contra ataques abusivos a su honra, reputación y su vida privada o familiar" consagrados en nuestra Constitución. *Bosch v. Editorial El Imparcial, Inc.*, ante, pág. 307.

Para que la *defensa* del privilegio del comentario imparcial sea válida y aceptable es necesario que concurran los siguientes elementos: el comentario debe (*a*) constituir una eva-

---

(25) De todas maneras, tanto en las jurisdicciones estatales como en la federal existe en la actualidad un debate sobre si la opinión del Tribunal Supremo federal en *Gertz v. Robert Welch, Inc.*, ante, tuvo el efecto de sustituir la protección que garantiza el *privilegio* del comentario imparcial por una protección más amplia al amparo de la Primera Enmienda. Véanse: *Ollman v. Evans*, 750 F.2d 970, 974–975 (D.C. Cir. 1984); *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 603 (1977), confirmado por 578 F.2d 442 (1978); *Koch v. Goldway*, 817 F.2d 507, 508 (1987); R. Sack, *Libel, Slander and Related Problems*, Nueva York, Practicing Law Institute, 1980, págs. 182–183.

luación intelectual; (*b*) estar basado en hechos o en aquello que se considere por una persona razonable normalmente como hechos; (*c*) estar libre de cualquier imputación de motivos sórdidos o corruptos; (*d*) ser el resultado de una opinión honrada; (*e*) estar libre de malicia, y (*f*) ser relativo a un asunto de interés público. De la misma manera, expresamos que los elementos de imparcialidad no están presentes cuando: (*a*) la publicación incluye ataque a los motivos y al carácter de la persona no relacionados con asuntos a que se refiere el comentario o crítica; (*b*) discute su vida privada en relación con asuntos no relacionados al trabajo o actividad motivo de la crítica, y (*c*) se acusa de un crimen o se usan epítetos denigrantes o insultantes que no son necesarios para caracterizar su falta de idoneidad o su falta de cumplimiento con su deber. *Bosch v. Editorial El Imparcial, Inc.*, ante, págs. 308–309.

Examinado, a la luz de estos principios, el editorial publicado el día 13 de noviembre de 1981, *concluimos que al mismo le cobija la defensa del comentario imparcial.* Nada logramos con volver a enumerar en este momento todos y cada uno de los elementos que deben estar presentes para que sea válida la defensa; basta con señalar que hemos examinado los mismos y en nuestra opinión el referido editorial cumple con todos ellos. Lo que es más, las excepciones que nuestra jurisprudencia ha reconocido a su existencia decididamente no están presentes. Siendo ello así, la "defensa del comentario imparcial" se alza como impedimento adicional a que prospere la presente reclamación por libelo como consecuencia de la publicación del editorial en controversia.

IV

La resolución recurrida, mediante la cual el tribunal de instancia denegó la solicitud de sentencia sumaria, no puede prevalecer. La demandante Villanueva carece totalmente de causa de acción en cuanto al codemandado El Vocero se refiere. En lo que respecta a la publicación de la noticia el día 11 de noviembre de 1981, aun considerándola como "persona privada", la deman-

dante no pudo demostrar que cuenta con evidencia para probar que medió negligencia por parte de El Vocero en la publicación de la misma; por otro lado, dicha información está protegida por el "privilegio del reporte justo y verdadero". En lo que concierne al editorial publicado por El Vocero el día 13 de noviembre de 1981, al mismo claramente le aplica la "defensa del comentario imparcial".

Por los fundamentos antes expresados, *expedimos el auto de certiorari radicado y se dictará sentencia revocatoria de la resolución recurrida, declarando, en consecuencia, sin lugar la demanda radicada por la demandante Marta Villanueva en cuanto al codemandado El Vocero de Puerto Rico, Inc.*

El Juez Asociado Señor Negrón García emitió opinión concurrente y de conformidad. El Juez Asociado Señor Hernández Denton emitió opinión disidente, a la cual se unieron los Jueces Asociados Señora Naveira de Rodón y Señor Alonso Alonso.

—O—

Opinión concurrente y de conformidad del Juez Asociado Señor Negrón García.

EN EL JUZGAR, EL SENTIDO COMÚN TIENE UN PAPEL PREPONDERANTE. "Recordemos lo dicho por Biondi. El absurdo jurídico no es el absurdo lógico, es lo injusto. Por lo demás, creo que cuando un absurdo, una injusticia se da, el absurdo jurídico es absurdo lógico también, *porque aun cuando sea perfectamente lógico en una lógica puramente formal, ha de ser ilógico para toda lógica humana, para una lógica jurídica.*" (Énfasis suplido.) J. Vallet de Goytisolo, *Panorama del Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1973, pág. 870.

I

Hacer cumplida justicia implica, pues, con sentido común, exaltar los valores fundamentales humanos y descartar toda

aplicación literal de reglas procesales que menoscaben ese fin. Hemos de evitar interpretaciones cuya utilidad y producto final sea únicamente un mero recurso de técnica jurídica, mito o criatura artifical.

La opinión disidente del Juez Asociado Señor Hernández Denton propone que nos declaremos sin jurisdicción. La INJUSTICIA de esa alternativa nos fuerza a fundamentar separadamente nuestro criterio en contrario. DEMOSTRAREMOS QUE LA ECUACIÓN MINORITARIA SE NUTRE DE *UN ERROR CIRCULAR: SIN TENER JURISDICCIÓN, "SUA SPONTE" SE ASUME, PARA LUEGO EQUIVOCADAMENTE CONCLUIR QUE NO SE TIENE.*

*Primero*, nadie ha cuestionado ante nos la juridicidad del dictamen del Tribunal Superior, Sala de San Juan (Hon. William Fred Santiago, Juez). Éste, el 23 de febrero de 1990, en reconsideración, dejó sin efecto la sentencia desestimatoria de 28 de noviembre —por incomparecencia a la vista de 23 de octubre— y reinstaló la acción de la Sra. Marta Villanueva.

*Segundo*, en sus *méritos*, evidentemente, la actuación del ilustrado juez que acogía esa reconsideración fue fundamentada en las válidas razones que le fueron expuestas. La señora Villanueva no compareció al señalamiento, pues estaba cumpliendo con nuestra Resolución de 19 de enero de 1989 en que le requerimos que mostrara causa por la cual no deberíamos expedir el *certiorari*.

Así, quedó demostrado que el 16 de octubre, mediante Moción Informativa, la demandante Villanueva le comunicó del trámite de *certiorari* y que el caso no podría "ventilarse los días 23 y 24, según programado". Desafortunadamente ese escrito nunca llegó a la atención del Juez Fred Santiago, pues fue devuelto por la Secretaría bajo la impresión de que era una solicitud de suspensión y no acompañaba el sello correspondiente.

De hecho, la Minuta de 23 de septiembre de 1989 confirma ese desconocimiento. El Juez Fred Santiago partió de la premisa que los "trámites en el Hon. Tribunal Supremo de Puerto Rico. . . *han sido resueltos . . .*". (Énfasis suplido.)

## II

Lo anterior sería suficiente para apreciar lo erróneo de la opinión disidente. Pero hay más. Conforme los autos originales, el tribunal de instancia reconsideró *en la primera oportunidad que tuvo*, esto es, el 23 de febrero de 1990, al otro día de serle referida para "despacho" la moción.

En *Suárez v. Flamingo Homes, Inc.*, 102 D.P.R. 664, 668–669 (1974) —al resumir las avenidas decisorias que pueden seguir los tribunales ante las mociones de reconsideración— enfatizamos el extremo siguiente:

> . . . Se llama la atención a los secretarios de las diferentes salas del Tribunal de Primera Instancia, *que deben dar estricto cumplimiento* a la Regla 12.1 de las de Administración del Tribunal de Primera Instancia, que lee así:

> "Regla 12.1. Sumisión de mociones de reconsideración al juez

> Cuando se radicare una moción solicitando la reconsideración de una sentencia, orden o resolución, *el secretario deberá dar cuenta de la misma al juez que la hubiere dictado*, al juez que le sustituyere, o al juez administrador, a más tardar dentro *de las 24 horas de su presentación.*" (Énfasis suplido y en el original.)

NO PODEMOS, PUES, REFRENDAR LA PROPUESTA DISIDENTE QUE IGNORA UN INCUMPLIMIENTO MINISTERIAL TAN CRASO. UN SISTEMA JUDICIAL *SERIO*, NO "RESUELVE" NI ADMINISTRA JUSTICIA DE ESTE MODO. *EL AUTOMATISMO VISUALIZADO EN LA REGLA 47 DE PROCEDIMIENTO CIVIL, 32 L.P.R.A. AP. III, DE "DEJAR DE TOMAR ALGUNA ACCIÓN" —COMO EQUIVALENTE AL "RECHAZO DE PLANO"— ESTÁ CIMENTADO Y PRESUPONE QUE EL SECRETARIO HA DADO CUMPLIMIENTO SUSTANCIAL A LA REGLA 12.1 PARA LA ADMINISTRACIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA DEL ESTADO LIBRE ASOCIADO, 4 L.P.R.A. AP. II-A.* NO ES OBLIGACIÓN DE LOS ABOGADOS POSTULANTES ESTAR DETRÁS DE LOS JUECES INQUIRIENDO EN SUS OFICINAS SI LA SECRETARÍA LES REFIRIÓ DETERMINADA

MOCIÓN DE RECONSIDERACIÓN. AUNQUE ESA SOLA GESTIÓN NO VIOLA LA ÉTICA, NO DEBE FOMENTARSE.

De hecho, si ignoráramos la *VERDAD PROCESAL* aquí expuesta —y acogiéramos el razonamiento del disenso— los autores de la sentencia no serían el Juez Asociado Señor Hernández Denton ni la mayoría del Tribunal. Tampoco el juez de instancia. Su autoría realmente correspondería a la Secretaría del Tribunal Superior, quien con su inacción "rechazó de plano" la reconsideración. *ESTARÍAMOS, ENTONCES, ANTE UNA FARSA ADJUDICATIVA EN MENOSCABO DEL PRESTIGIO DE LOS TRIBUNALES.* ·

### III

Resumiendo, el planteamiento en torno a la reapertura del caso no está ante este Foro. *Ninguna de las partes lo ha traído. Si lo consideramos en sus méritos habría que confirmarlo.* Es claro que el juez, Hon. Fred Santiago, detectó y apreció válidos fundamentos para dejar sin efecto la sentencia de archivo a tono con el espíritu que anima la Regla 49.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Sostener el criterio minoritario de que no podía hacerlo, a base de que el escrito de reconsideración "no constitu[ía] una petición al amparo de la Regla 49.2" (opinión disidente, pág. 665), *es simplemente olvidar que nuestro derecho ya superó la mística de las palabras. LA SUSTANCIA, NO LA LETRA, ES LO QUE CUENTA.* Regla 70 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Más importante aún, *la intervención del Juez Fred Santiago fue en la primera oportunidad en que se le remitió a su despacho para que considerara la moción de reconsideración.* Obviamente estamos ante una situación *extraordinaria* causada por un *grave incumplimiento de la Regla 12.1 para la Administración del Tribunal de Primera Instancia del Estado Libre Asociado,* supra. ALLÍ DONDE SE REQUIEREN VEINTICUATRO (24) HORAS, LA MOCIÓN DE RECONSIDERACIÓN FUE REMITIDA A LA ATENCION DEL JUEZ CON UN ATRASO DE

MIL SETECIENTAS CUATRO (1,704) HORAS. SI ANTE ESTA REALIDAD NO APLICA LA REGLA 49.2, *SUPRA*, ¿A CUÁL APLICA?

Por los fundamentos expuestos, rehusamos sostener la ausencia de jurisdicción. La VERDAD y la JUSTICIA, como fuerzas vivas, no pueden cimentarse en tan frágil ficción; menos en semejante ineficiencia administrativa burocrática. *AUNQUE GUARDIANES DE ESTA JURISDICCIÓN APELATIVA, NUESTRO CELO MAYOR ES PREVENIR LAS INJUSTICIAS.*

—O—

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se unen la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Alonso Alonso.

Mediante la utilización de una ficción jurídica, una mayoría de este Tribunal revoca nuestros precedentes y enmienda sustancialmente la Regla 47 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Por considerar que no tenemos jurisdicción para adjudicar la controversia del caso de autos, disentimos de la opinión del Tribunal.

I

Para evaluar adecuadamente el impedimento jurisdiccional identificado, veamos el azaroso trámite procesal por el cual ha atravesado el presente caso, según surge de los autos originales elevados *sua sponte* por este Tribunal y de los expedientes del recurso ante nos.

El 20 de septiembre de 1982, la Sra. Marta Villanueva presentó en la Sala de San Juan del Tribunal Superior una acción civil en daños y perjuicios contra el coronel Catalino Hernández Class, los policías Oseas Torréns Castro y Raúl Maldonado Coreano, el Sr. Rafael González Méndez y contra el periódico El Vocero de Puerto Rico (El Vocero). En síntesis, la demandante

alegó que los policías demandados suministraron al periódico, con ánimo de exponerla al escándalo público, información relacionada con unos delitos alegadamente cometidos por ella. Al periódico El Vocero le reclamó haber publicado información libelosa y a los demandados Hernández Class y González Méndez les imputó persecución maliciosa.

Después de múltiples prórrogas, reconvenciones, contestaciones, enmiendas, cambios de representación legal, una moción de desestimación y/o de sentencia sumaria presentada por El Vocero, y luego de que concluyera el descubrimiento de prueba, se señaló vista en su fondo para el 23 de febrero de 1988, o sea, casi seis (6) años después de haberse iniciado el pleito. Dicha vista fue transferida en tres (3) ocasiones posteriores hasta que finalmente se señaló para el 13 de diciembre de 1988. Esta vez el juez aclaró que no sería pospuesta.

Sin embargo, un mes antes de la vista, El Vocero presentó una segunda moción de sentencia sumaria que fue declarada sin lugar. Nuevamente el tribunal se vio en la obligación de posponer el señalamiento porque El Vocero adujo que revisaría mediante *certiorari* en este Tribunal la Orden de 28 de noviembre de 1988 que denegaba la sentencia sumaria.

El 8 de diciembre de 1988, con votación dividida, declaramos sin lugar el recurso de *certiorari* presentado.[1] No obstante, el 19 de enero de 1989 reconsideramos nuestro anterior dictamen y concedimos término a la parte demandante recurrida para que mostrara causa por la cual no debíamos "reconsiderar y dejar sin efecto la Resolución emitida con fecha de 8 de diciembre de 1988, mediante la cual se negó la expedición del auto de *certiorari*". La parte demandante compareció el 13 de marzo de 1989.

Mientras tanto, en ausencia de una orden de este Tribunal que paralizara los trámites en el foro de instancia, el 2 de mayo de

---

[1] El texto de la Resolución de 8 de diciembre de 1988 es el siguiente:

"A la solicitud de *certiorari*, no ha lugar.

"Lo acordó el Tribunal y certifica el señor Secretario General. Los Jueces Asociados Señores Rebollo López y Hernández Denton paralizarían y expedirían. El Juez Asociado Señor Ortiz no intervino."

1989 el Tribunal Superior reseñaló la vista para 23 y 24 de octubre de 1989, con apercibimiento de que el caso no sería suspendido. También advirtió que se le impondrían sanciones severas a la parte que no compareciera o adujera que no estaba preparada. Sin embargo, a dicha vista sólo compareció la representación legal del Estado. Ni la parte demandante ni El Vocero compareció. De la Minuta de 23 de octubre de 1989 se desprende que el tribunal de instancia dictó en corte abierta la sentencia siguiente:

> En el día de hoy no ha comparecido la parte demandante ni su abogado, tampoco ha comparecido el codemandado El Vocero de Puerto Rico ni su representación legal, Lic. Juan R. Marchand.
>
> En virtud de lo ordenado el 2 de mayo de 1989 y no habiendo comparecido la parte demandante ni el abogado del codemandado El Vocero de Puerto Rico, el Tribunal ordena el archivo del caso por falta de interés no habiéndose excusado ninguno de los demandantes ni su abogado.

El 28 de noviembre de 1989 se redujo a escrito la sentencia dictada y el 29 de noviembre de 1989 se notificó. La parte demandante solicitó reconsideración de la sentencia el 13 de diciembre del mismo año. En la misma intentó justificar las razones de su incomparecencia. Como el tribunal de instancia no consideró la moción de reconsideración dentro del término de diez (10) días, la misma —por virtud de lo establecido en la Regla 47 de Procedimiento Civil, *supra*— se considera que fue denegada de plano.

Por ser el Estado una de las partes, el término para recurrir a este Tribunal era de sesenta (60) días, contados a partir del archivo en autos de una copia de la notificación de la sentencia. Regla 53.1(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III. Como la parte demandante no recurrió ante nos dentro de este término, la sentencia advino final y firme el 29 de enero de 1990.

Sin embargo, el 23 de febrero de 1990, a los ochenta y seis (86) días de haberse archivado en autos la sentencia, el tribunal de instancia acogió la moción de reconsideración y dejó sin efecto la sentencia mediante una orden notificada el 2 de marzo de ese año.

De esta resolución El Vocero solicitó reconsideración. El 23 de abril de 1990 el tribunal la declaró sin lugar. No recurrió ante este

Foro. Expuestos los hechos y el trámite procesal, estudiemos el derecho aplicable.

## II

Contrario a la norma general en el derecho de que los remedios obtenidos en el foro judicial hay que solicitarlos antes de entender en cualquier controversia jurídica, los tribunales tenemos el deber y la ineludible obligación de examinar si tenemos jurisdicción para así proceder. *Soc. de Gananciales v. A.F.F.*, 108 D.P.R. 644 (1979). Debemos advertir que el término "jurisdicción" significa el poder o la autoridad de un tribunal para adjudicar un caso o controversia y que es fundamental a la validez de un procedimiento judicial:

(1) La ausencia de jurisdicción envuelve un defecto radical que implica la nulidad absoluta de una sentencia . . . .

(2) El poder jurisdiccional es esencial a la validez de los procedimientos, y no puede ser renunciado por las partes. . . . *Rodríguez v. Registrador*, 75 D.P.R. 712, 718 (1953).

Al amparo de este precepto, nos corresponde siempre ser los guardianes de nuestra jurisdicción, no siendo óbice para ello el hecho de que la cuestión no se nos haya planteado. *López Rivera v. Autoridad Fuentes Fluviales*, 89 D.P.R. 414 (1963), citado con aprobación en *Gobernador de P.R. v. Alcalde de Juncos*, 121 D.P.R. 522 (1988). En el caso particular de los foros apelativos, nos corresponde examinar no solamente si tenemos jurisdicción para resolver la controversia sometida, sino también si los tribunales de instancia tenían jurisdicción sobre la materia. 2 *Fed. Proc.*, L. Ed. Sec. 3:646.

Distinto a las cuestiones de jurisdicción sobre la persona, la jurisdicción sobre la materia no se le puede otorgar al tribunal por las partes. Si se carece de jurisdicción sobre la materia, se dan las "consecuencias inexorablemente fatales" de que el tribunal está impedido de entender en él y sus dictámenes son nulos. No olvidemos que la jurisdicción "solo puede conferirla la ley y nunca los litigantes". *Román v. Corte Mpal.*, 59 D.P.R. 482, 486 (1941).

En otras palabras, la falta de jurisdicción no es susceptible de ser subsanada. *Rodríguez v. Registrador*, supra, pág. 718.

En *E.L.A. v. Aguayo*, 80 D.P.R. 552, 559 (1958), ratificamos que los tribunales tenían la "facultad inherente y el deber . . . de investigar, en las ocasiones necesarias, las circunstancias en las cuales se originan y desarrollan los litigios".(2)

Recientemente, el Tribunal Supremo federal reafirmó este principio fundamental al resolver lo siguiente:

> "[C]ada corte federal apelativa tiene una especial obligación de 'asegurarse no sólo de su propia jurisdicción, sino también de la jurisdicción de los tribunales inferiores en un caso bajo revisión,' aun cuando las partes estén dispuestas a concederla. *Mitchell* v. *Maurer*, 293 U.S. 237, 244 (1934). Véase *Juidice* v. *Vail*, 430 U.S. 327 (1977) . . . . 'Y si el expediente revela que el tribunal inferior carecía de jurisdicción esta corte tomará conocimiento del defecto aunque las partes no lo planteen.'" (Traducción nuestra.) *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986).

Procede, por ende, que resolvamos en primer término si tenemos jurisdicción para resolver la controversia presentada por el El Vocero mediante el recurso de *certiorari*.

## III

El auto de *certiorari*, gobernado por los Arts. 670 y 671 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3491 y 3492, se ha definido de.la forma siguiente:

> El auto de *certiorari* es un auto expedido por un tribunal superior a otro inferior, por el cual se exige del último la remisión al primero

---

(2) Cabe señalar que, aun cuando no se trata de materia jurisdiccional, los tribunales no estamos siempre limitados a adjudicar únicamente las cuestiones expuestas por las partes. En *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486, 511–512 (1990), ante una situación sobre la cual no estábamos obligados a expresarnos por no haber sido señalada como error, dijimos:

"No obstante nuestro sistema de derecho ser uno rogado y de carácter adversativo, hemos resuelto que *con el propósito de hacer la mejor justicia de que somos capaces, aun cuando la parte recurrente no lo señale o no lo levante como error, este Tribunal entenderá en todas aquellas cuestiones que a su juicio ameritan ser consideradas y resueltas en un recurso. Dávila v. Valdejully*, 84 D.P.R. 101 (1961). Ello nos obliga a entender, motu propio, en dicho punto."

de una copia certificada de las diligencias pendientes en el tribunal inferior o los autos de alguna causa ya terminada, en aquellos casos en que el procedimiento adoptado no esté de acuerdo con las prescripciones de la ley, y con objeto de terminar los procedimientos cuando el tribunal inferior rehusare hacerlo fundado en bases erróneas. Art. 670 del Código de Enjuiciamiento Civil, *supra.*

El procedimiento para presentar dicho recurso está regido por las Reglas 21, 22 y 23 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. I-A.

A diferencia del escrito de apelación o de la solicitud de revisión, la presentación del recurso de *certiorari* no suspende los procedimientos en el tribunal de instancia —J.A. Cuevas Segarra, *Práctica Procesal Puetrorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1983, Vol. II, pág. 312— a menos que este Tribunal así lo ordene en auxilio de su jurisdicción. Es una vez que se expide el auto de *certiorari* que se paralizan todos los procedimientos en el tribunal de instancia que pudieran afectar nuestra jurisdicción sobre el asunto planteado en el recurso. Véase, además, *Vda. de Carmona v. Carmona*, 93 D.P.R. 140 (1966).

En el caso de autos, este Tribunal nunca expidió el auto de *certiorari.* De hecho, inicialmente este Tribunal denegó el recurso solicitado y no fue hasta la etapa de reconsideración que por primera vez concedimos término a la parte recurrida para mostrar causa. En esa segunda ocasión tampoco expedimos el auto. La parte recurrida compareció el 13 de marzo de 1989 y *hoy* expedimos el auto y resolvemos la controversia.

Por lo tanto, a pesar de que El Vocero presentó el *certiorari* ante nos, como no expedimos el auto ni paralizamos los procedimientos en el Tribunal Superior, dicho foro podía continuar los procedimientos y terminar el pleito, como así lo hizo, el 28 de noviembre del pasado año 1989. Una vez advino final y firme la sentencia desestimatoria, el tribunal a quo carecía de jurisdicción para reconsiderar su dictamen y este Tribunal tampoco tiene autoridad para adjudicar la controversia.

Reiteradamente hemos resuelto que los términos para recurrir en alzada y solicitar reconsideración de una sentencia son

jurisdiccionales. Si la parte recurrente no cumple con estos términos, el tribunal deja de tener jurisdicción sobre la materia. Precisamente para impartirle certeza al término para recurrir en alzada es que nuestro ordenamiento procesal provee, a manera de excepción, que dicho término sólo se puede interrumpir por la presentación en tiempo de una moción con la cual se solicitan determinaciones de hechos adicionales (Regla 43.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III), una moción de nuevo juicio (Regla 48 de Procedimiento Civil, 32 L.P.R.A. Ap. III) y una moción de reconsideración debidamente acogida (Regla 47 de Procedimiento Civil, *supra*).

En cuanto a la moción de reconsideración la Regla 47 de Procedimiento Civil, *supra*, dispone que:

La parte adversamente afectada por una resolución, orden o sentencia podrá, dentro del término de quince (15) días desde la fecha de la notificación de la resolución u orden o desde la fecha del archivo en los autos de una copia de la notificación de la sentencia, presentar una moción de reconsideración de la resolución, orden o sentencia. *El tribunal dentro de los diez (10) días de haberse presentado dicha moción, deberá considerarla.* Si la rechazare de plano, el término para apelar o solicitar revisión se considerará como que nunca fue interrumpido. Si se tomare alguna determinación en su consideración, el término para apelar o solicitar revisión empezará a contarse desde la fecha en que se archiva en los autos una copia de la notificación de la resolución del tribunal resolviendo definitivamente la moción. *Si el tribunal dejare de tomar alguna acción con relación a la moción de reconsideración dentro de los diez (10) días de haber sido presentada, se entenderá que la misma ha sido rechazada de plano.*

Cuando el término para recurrir de una sentencia fuere interrumpido en virtud de esta regla, la interrupción beneficiará a cualquier otra parte que se hallare en el pleito.— Enmendada en Agosto 4, 1979, Núm. 197, p. 609, art. 1, ef. Agosto 20, 1979. (Énfasis suplido.)

Mucho se discutió sobre si los tribunales perdían jurisdicción sobre un caso si los diez (10) días concedidos por las Reglas de Procedimiento Civil transcurrían sin que hubiesen tomado acción. No obstante, desde *El Mundo, Inc. v. Tribunal Superior*, 92

D.P.R. 791, 801 (1965), resolvimos en la negativa. Allí, al considerar la antigua Regla 47 (que en lo único que ha variado es en los días que tienen el juez para considerar) dijimos:

. . . [U]na vez presentada en tiempo la moción de reconsideración, y resuelta por el Tribunal declarándola sin lugar de plano, bien por acción afirmativa o bien por inacción dentro de los 5 días de su presentación, el Tribunal no queda privado de su facultad para reconsiderar esa actuación suya si considera que en realidad la moción de reconsideración plantea una cuestión sustancial y meritoria y que en bien de la justicia debe señalar una vista para oir a las partes, siempre que ya no se le haya privado de jurisdicción por razón de haberse interpuesto contra la sentencia un recurso de apelación o de revisión *o no haya expirado el término para interponer dichos recursos.* (Énfasis suplido.) Véase, también, *Torres Torres v. Tribunal Superior,* 101 D.P.R. 277 (1973).

Además, en *Suárez v. Flamingo Homes, Inc.,* 102 D.P.R. 664, 669 (1974), resolvimos que luego de expirado el término que tiene el tribunal para considerar la moción de reconsideración —cinco (5) días bajo la anterior Regla 47, diez (10) días bajo la actual— éste puede "*señalar la moción para vista*; o decretar 'no ha lugar' o 'con lugar', siempre y cuando no haya pasado en exceso del término de treinta días del archivo en autos de copia de la notificación de la sentencia. Si la señala para vista, el término de apelación o revisión se interrumpe". (Énfasis en el original.)

Para darle certeza al término para recurrir en alzada, la Regla 47 de Procedimiento Civil, *supra,* establece un término de diez (10) días para que el tribunal de instancia actúe sobre la misma. Bajo el palio de este ordenamiento procesal se han establecido unos términos claros y precisos que permiten a las partes afectadas con un dictamen adverso recurrir oportunamente a esta Curia. Desde la aprobación de nuestro ordenamiento procesal, todas las partes han litigado sus controversias con la seguridad de que hay unos términos claros y precisos para recurrir ante nos.

Por otro lado, no procede que invoquemos la Regla 12.1 para la Administración del Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico (en adelante Reglas para la Administración de los Tribunales), 4 L.P.R.A. Ap. II-A., para

justificar que su incumplimiento por los secretarios de las diferentes salas del Tribunal de Primera Instancia tiene el efecto de interrumpir el plazo *jurisdiccional* de la Regla 47 de Procedimiento Civil, *supra*, para recurrir a esta Curia y, por ende, enmendar las Reglas de Procedimiento Civil.

En el caso de autos, como el tribunal no acogió la moción de reconsideración durante el término para interponer el recurso de revisión, dicho foro carecía de jurisdicción para actuar sobre el escrito por haber transcurrido más de sesenta (60) días desde el archivo en autos de la sentencia. El pleito, por lo tanto, concluyó con la Sentencia de 28 de noviembre de 1989 que archivaba la demanda por falta de interés.

Nunca hemos permitido que una parte en un litigio descanse en las Reglas de Administración de los Tribunales para evadir los términos claros y precisos de carácter jurisdiccional provistos por las Reglas de Procedimiento Civil, según fueron adoptadas por este Tribunal y aprobadas por la Asamblea Legislativa al amparo de nuestro ordenamiento constitucional. El Art. V, Sec. 6 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 357, establece la manera en que se aprueban las reglas de evidencia —procedimiento civil y criminal— y concede a la Asamblea Legislativa la facultad de "enmendar, derogar o complementar . . . dichas reglas, mediante ley específica a tal efecto".

La facultad de este Tribunal para adoptar reglas de administración de los tribunales dispuestas en la Sec. 7 del Art. V, Const. E.L.A., *supra*, no nos concede la autoridad para, a través de estas normas, "enmendar, derogar o complementar" las Reglas de Procedimiento Civil previamente aprobadas mediante el procedimiento establecido en la Constitución.

Invocar las Reglas de Administración de los Tribunales para permitirle al foro de instancia reconsiderar su dictamen fuera del término provisto por nuestro ordenamiento procesal, también tendrá el efecto de que las partes nunca estarán seguras de que el término para recurrir en alzada ha comenzado a transcurrir. En teoría, el foro de instancia podría reconsiderar, aun en la etapa de

ejecución, alegando que no le trajeron la moción a su atención hasta ese momento.

Precisamente, por ser éste un sistema de derecho rogado, las Reglas de Procedimiento Civil imponen a la parte que solicita la reconsideración el deber de recurrir en alzada, dentro del término provisto por ley, si el juez no actúa dentro de los diez (10) días de la presentación de la moción de la reconsideración.

Tampoco procede invocar la Regla 49.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, como sustituto del recurso de revisión de una sentencia archivada por falta de interés de la parte demandante. *Rodríguez v. Tribunal Superior,* 102 D.P.R. 290 (1974). En el caso de autos, la parte demandante sometió una moción de reconsideración en la que aducía como único fundamento *que no se enteró del señalamiento de la vista de 28 de noviembre.* Su escrito no constituye una petición al amparo de la Regla 49.2 de Procedimiento Civil, *supra.* Por su parte, el foro de instancia consideró el escrito como una moción de reconsideración y no como una moción al amparo de la Regla 49.2, *supra.* Si este Tribunal, en aras de emitir un pronunciamiento sobre una controversia que se tornó académica, considera el escrito de reconsideración sometido en este caso como una moción al amparo de la Regla 49.2, *supra,* estaríamos por fíat judicial derogando la Regla 47 de Procedimiento Civil, *supra,* ignorando así los preceptos rectores de certeza y de precisión en los términos apelativos que contiene nuestro ordenamiento procesal.

Aunque en *Sucn. Bravo v. Srio. de Hacienda,* 106 D.P.R. 672 (1978), permitimos que la parte perdidosa invocase la Regla 49.2 de Procedimiento Civil, *supra,* para corregir "un error a todas luces injusto", en este caso la situación procesal era totalmente diferente. En primer lugar, a diferencia del caso de autos, allí los demandantes en efecto presentaron una moción al amparo de la referida Regla 49.2. En segundo lugar, nuestros pronunciamientos en ese caso perseguían el propósito de *reabrir* un pleito ya adjudicado para que el tribunal de instancia dilucidara en vista plenaria la prueba de las partes y lo resolviese en sus méritos. De

esa manera las partes tuvieron una nueva oportunidad de ser oídas por el tribunal.

El dictamen que hoy emite este Tribunal no tiene el propósito de revocar la sentencia recurrida ni de asegurar que el pleito se resuelva en sus méritos en el Tribunal Superior. Todo lo contrario. Al igual que el foro de instancia, la decisión del Tribunal desestima la demanda incoada contra El Vocero al resolver que procedía una sentencia sumaria a favor del periódico. Para todas las partes ante nos, el resultado es el mismo que el de la sentencia dictada por el Tribunal Superior el 28 de noviembre de 1989. En estas circunstancias, ¿cuál es el propósito de la opinión emitida por este Tribunal? ¿No constituyen los pronunciamientos del Tribunal una opinión consultiva vedada desde *E.L.A. v. Aguayo*, supra, y *Hernández Agosto v. Betancourt*, 118 D.P.R. 79 (1986)?

## IV

Examinado el trasfondo doctrinal y fáctico anterior, procede el análisis del efecto que tiene la ausencia de jurisdicción del Tribunal Superior en este caso sobre la petición de *certiorari* ante nos, en la que se cuestiona una resolución interlocutoria. Independientemente de nuestra inclinación original a que el foro de instancia debió haber desestimado la demanda mediante sentencia sumaria, una vez advino *final y firme* la sentencia desestimatoria, carecemos de jurisdicción para resolver la controversia expuesta en el *certiorari* presentado por el periódico.

En *Suárez v. Flamingo Homes, Inc.*, supra, pág. 669, ante una situación donde el juez de instancia emitió un "no ha lugar" luego de pasado el término para revisar, dijimos que:

> El hecho de que el juez de instancia diera un "no ha lugar" a la moción de reconsideración, luego de pasado el término para apelar, no nos da jurisdicción, *pues dicha actuación se llevó a cabo cuando el tribunal de instancia ya no tenía jurisdicción, sobre el presente caso*. (Énfasis suplido.)

Como el recurso presentado en el caso de autos no interrumpió los procedimientos en instancia y éstos continuaron, llegando

hasta su fin el pleito con una sentencia final y firme, este caso concluyó hace un (1) año. *No tenemos jurisdicción para resolver el asunto interlocutorio que origina el "certiorari" y debemos abstenernos de considerar las controversias planteadas en el recurso.*

En el caso de autos, no cabe duda de que la moción llegó tardíamente a manos del juez. Sin embargo, ¿relevaba este hecho a los peticionarios de su deber ineludible, ante un término jurisdiccional, de recurrir en alzada si a los diez (10) días el tribunal no tomaba acción sobre la moción de reconsideración? ¿Les permitía este hecho cruzarse de brazos e ignorar el mandato expreso de ley de que su moción había sido rechazada de plano? Creemos que no. Independientemente de las razones que tuviera el Tribunal Superior para no considerar la reconsideración, si a los diez (10) días de su presentación no se tomó acción alguna sobre ella, los peticionarios tenían que considerarla denegada de plano, con todas las consecuencias que esto entraña. Procedía entonces que recurrieran ante esta Curia dentro del término jurisdiccional para solicitar revisión.

La interpretación que hoy hace el Tribunal milita en contra del sabio mecanismo de denegatoria de plano prescrito por las reglas. Resolver que el hecho de que la moción de reconsideración fue llevada tardíamente a manos del juez tiene la consecuencia de hacer que el término de diez (10) días que establece la Regla 47 de Procedimiento Civil, *supra*, no empiece a transcurrir, es elaborar una ficción jurídica insostenible mediante una interpretación que ignora la intención y el propósito de dicha regla y el mandato expreso de que ésta ha de ser interpretada de forma tal que se logre justicia rápida y económica. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. La certeza requerida por el ordenamiento procesal impide que le restemos finalidad a los procedimientos judiciales. La posición de la mayoría supone, además, que los peticionarios sabían que la moción no había llegado a manos del juez y por eso ignoraron el término de diez (10) días. No podemos refrendar una interpretación judicial que premia la displicencia e inobservancia de disposiciones procesales claras e inequívocas ni

que pretende desde este estrado apelativo subsanar los problemas administrativos de la Secretaría del foro de instancia.

Ya desde el 1942 habíamos resuelto que al solicitar la reconsideración la parte lo hace a riesgo de perder su derecho de apelación por expiración del término estatutario si su moción es rechazada de plano. *Marcano v. Marcano*, 60 D.P.R. 351, 352 (1942).[3] En *Suárez v. Flamingo Homes, Inc.*, supra, págs. 666–667, al expresarnos sobre el término que entonces establecía la Regla 47 de Procedimiento Civil, *supra*, para que se entendiese rechazada de plano la moción de reconsideración, dijimos:

> . : . "el término de 5 días dentro del cual la corte 'deberá resolver' la moción de reconsideración, no es un término fatal de carácter jurisdiccional y sí puramente directivo," no quiere decir que el tribunal de instancia podía actuar, ya bien sea señalando la moción o declarándola con lugar y sin lugar, luego de pasados los 30 días del archivo en autos de una copia de la notificación de la sentencia, porque actuaría sin jurisdicción.

La única protección que tiene una parte contra el riesgo de que transcurra el término jurisdiccional que establece la Regla 53 de Procedimiento Civil, 32 L.P.R.A. Ap. III, para apelar o revisar una sentencia luego de haber presentado una moción de reconsideración, es presentar su escrito de apelación o revisión a tiempo sin esperar a que el tribunal actúe sobre dicha moción. La experiencia ha refrendado la sabiduría de esta norma procesal que hoy la mayoría del Tribunal socava. Tampoco nos convence la jurisprudencia citada por la mayoría en apoyo de su interpretación flexible del mecanismo de reconsideración.

Los casos *Figueroa Rivera v. Tribunal Superior*, 85 D.P.R. 82 (1962), y *Vda. de Carmona v. Carmona*, supra, en nada abonan al pronunciamiento de que, como en este caso la Secretaría fue negligente, "una parte sea despojada de su derecho a revisar una sentencia . . .". (Énfasis suprimido.) Opinión mayoritaria, pág. 636.

---

(3) En esta fecha estaba vigente el Art. 292 del Código de Enjuiciamiento Civil, según enmendado por la Ley Núm. 67 de 8 de mayo de 1937 (32 L.P.R.A. ant. sec. 1251).

En aquellos casos el derecho de las partes afectadas por la decisión adversa estaba subordinado a que el Secretario les notificara a tiempo que la copia de la resolución o sentencia estaba archivada en autos y que, por lo tanto, corría en su contra el plazo para solicitar reconsideración o revisión. Esta no es la situación del caso de autos. *Independientemente de lo que hiciera el Secretario en este caso*, aunque incumpliera con la Regla 12.1 para la Administración de los Tribunales, *supra*, los peticionarios estaban obligados a recurrir en alzada dentro del término de treinta (30) días de habérsele notificado el archivo en autos de una copia de la sentencia, a menos que dentro de ese término el tribunal considerase la moción de reconsideración. Es decir, lo que distingue la situación de autos de las controversias suscitadas en la jurisprudencia citada por la mayoría es que en aquellos casos el derecho de las partes a lograr la revisión de la sentencia u obtener remedios postsentencia dependía de que el Secretario cumpliera con su deber ministerial, mientras que en el de autos el ejercicio del derecho a la revisión no dependía de actuación ministerial alguna por parte del Secretario. Por virtud de disposición expresa de ley, la parte sabía el término que tenía para recurrir en alzada y podía optar por ejercer o no este derecho. En el caso de autos optó por no ejercerlo. El condemandado El Vocero tenía a su haber una sentencia final, firme y ejecutable que el foro de instancia no tenía facultad para alterar o dejar sin efecto mediante la consideración tardía de la moción de reconsideración.

La consecuencia última de la interpretación que hoy hace la mayoría de este tribunal de la Regla 47 de Procedimiento Civil, *supra*, es que el término de diez (10) días para considerar una moción de reconsideración como denegada de plano empieza a correr, no a partir de la presentación de la moción de reconsideración, como claramente prescribe la regla, sino a partir de que el juez de instancia advenga en conocimiento de la existencia de la moción que está pendiente ante el Tribunal. La mayoría elimina la certeza en cuanto a cuándo adviene a ser una sentencia final, firme y ejectuable, y cuándo tiene una parte que presentar escrito de revisión o apelación.

Cabe señalar, además, que lo que el tribunal de instancia concedió, mediante la sentencia desestimatoria de 28 de noviembre de 1989, *es precisamente lo que en su escrito de "certiorari" nos solicita el peticionario El Vocero: la desestimación de la reclamación de libelo y difamación.* Lo único que varía, entre la sentencia de instancia y la opinión que hoy suscribe la mayoría de este Tribunal, son los fundamentos. En ambas se desestima la demanda contra El Vocero. Es norma reconocida que la revisión se da contra la sentencia. *El Vocero v. Junta de Planificación,* 121 D.P.R. 115 (1988); *Sánchez v. Eastern Air Lines, Inc.,* 114 D.P.R. 691, 695 (1983); *Collado v. E.L.A.,* 98 D.P.R. 111, 114 (1969); *Rodríguez v. Serra,* 90 D.P.R. 776, 777 (1964). La parte favorecida por una sentencia no tiene motivo ni fundamento para solicitar su revisión. *Viera v. Comisión Hípica,* 81 D.P.R. 707, 720 (1960). Esta es la situación del peticionario El Vocero. Una vez recaída la sentencia desestimatoria, no se justificaba su solicitud. Había ganado su caso.

Considerando el resultado procesal del caso, es jurídicamente impropio expresarnos sobre la procedencia y los méritos de la moción de sentencia sumaria de El Vocero, con la cual solicitaba que el foro de instancia desestimara la acción incoada. En ausencia de jurisdicción, cualquier pronunciamiento de nuestra parte sobre el derecho aplicable al resolver una moción de sentencia sumaria, en un caso de libelo y difamación contra un periódico, constituye una opinión consultiva de este Tribunal vedada expresamente por nuestro ordenamiento. *E.L.A. v. Aguayo,* supra.

Independientemente de las partes en litigio o la importancia de la cuestión jurídica expuesta en el recurso, debemos evitar ceder a la tentación de emitir pronunciamientos a destiempo cuando no tenemos jurisdicción o cuando no hay un caso o controversia.

Sin embargo, como este Tribunal ha decidido seguir otro curso decisorio, nos vemos en la obligación de disentir de la opinión emitida hoy.

A modo de epílogo, este caso ejemplariza la necesidad de que le exijamos a los representantes legales de las partes involucradas en casos presentados ante este Foro que cumplan con su deber de informarle al Tribunal sobre cualquier actividad procesal que pueda afectar nuestra jurisdicción o convertir el recurso ante nos en académico. Como en el caso de autos, este Tribunal emitió únicamente una orden de mostrar causa por la cual no debíamos reconsiderar la resolución que denegaba la petición de *certiorari*; no se elevaron los autos originales ni se paralizaron los procedimientos en el foro de instancia. A modo de excepción, en este caso el Tribunal solicitó *sua sponte* que se elevaran los autos originales. Al examinarlos nos encontramos que se había desestimado la demanda por falta de interés de la parte demandante y, por ende, carecemos de jurisdicción para adjudicar la controversia originada por la resolución interlocutoria recurrida. No obstante, ninguna de las partes nos informó de los últimos desarrollos procesales en el caso. Era imperativo que las partes comparecieran inmediatamente ante nos a informarnos sobre estos extremos.

Deberíamos advertir a la profesión legal que, en futuras ocasiones, este tipo de actuación puede estar sujeta a severas sanciones económicas para así poder subsanar en alguna medida la inversión de tiempo, recursos y energía malgastados por este Tribunal en casos que han concluido.