RAMÓN E. TOLEDO MALDONADO, demandante y recurrente, *v.* DESIDERIO CARTAGENA ORTIZ y OTROS, demandados y recurridos.

*Número:* RE-86-233 *Resuelto:* 21 de diciembre de 1992

*Hiram Lozada Pérez*, abogado del recurrente; *Rafael E. García Rodón*, de *García Rodón, Correa Márquez y Valderas*, abogado de Desiderio Cartagena Ortiz, recurrido; *Modesto L. Rodríguez Suárez*, de *Arias Cestero & Arias Guardiola*, abogado de Carlos Romero Barceló, recurrido; *Manuel E. Andréu García*, de *Andréu García & Andréu García*, abogado del Estado Libre Asociado de Puerto Rico.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

I

El 16 de febrero de 1978, Ramón E. Toledo Maldonado fue detenido y arrestado por varios miembros de la Policía de Puerto Rico mientras conducía su vehículo de motor por la carretera Núm. 156 (rural) entre Caguas y Aguas Buenas. Fue denunciado por violaciones a las leyes de explosivos y de armas. En vista preliminar, el Tribunal de Distrito, Sala de Caguas, no determinó causa probable, archivó las denuncias y decretó su libertad; dictamen que se convirtió en final y firme.

Dos (2) años y algunos meses después —11 de septiembre de 1982— el periódico *The San Juan Star* publicó en su primera plana que en las vistas ante la Comisión del Senado que investigaba los sucesos del Cerro Maravilla, seis (6) policías y ex policías habían declarado que las denuncias contra Toledo Maldonado habían sido "fabricadas" por órdenes del entonces Coronel de la Policía Desiderio Cartagena Ortiz. Tres (3) de los testigos informaron a dicha Comisión que el Coronel Cartagena les ordenó "poner la bomba en manos del independentista Toledo".

Enterado así por la prensa, el 9 de septiembre de 1983 Toledo Maldonado presentó demanda ante el Tribunal Superior, Sala de San Juan, contra Cartagena Ortiz, en su capacidad personal y como Superintendente, el Teniente Juan Díaz y varios otros policías participantes, cuyos nombres desconocía. La acción se presentó bajo las disposiciones de la Ley federal de Derechos Civiles, el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, nuestra Carta de Derechos Constitucional y la Enmienda Décimocuarta de la Constitución federal.

En esencia, Toledo Maldonado planteó que los demandados, so color de autoridad, le privaron de sus derechos

constitucionales y estatutarios federales cuando lo acusaron falsamente, lo arrestaron y lo enviaron a la cárcel, todo ello maliciosamente y a sabiendas de que violaban su derecho al "disfrute de su propiedad al limitarle sus posibilidades de contratación en la empresa pública o privada por razón del estigma social que sufre en el país una persona acusada de 'poner bombas' ". Solicitud de revisión, pág. 3. Adujo que, incluso tuvo que abandonar sus estudios en la Facultad de Derecho de la Universidad Interamericana. Alegó que sufrió daños a su honra y a su reputación y experimentó angustias mentales valoradas en $500,000.

Acaecieron varios incidentes procesales. El caso fue trasladado a Caguas. El 28 de febrero de 1984, Toledo Maldonado desistió contra todos los codemandados, excepto Cartagena Ortiz. Oportunamente éste contestó, negó los hechos y cualquier participación directa o indirecta en los mismos. El 27 de diciembre de 1984 —a raíz de las vistas públicas del Senado de 11 y 20 de diciembre— Toledo Maldonado enmendó la demanda para incluir al Capitán Juan A. Díaz, al Estado Libre Asociado por alegada supervisión negligente, al entonces Gobernador Lcdo. Carlos Romero Barceló por supuestamente dar instrucciones para fabricar el caso, y a la Compañía de seguros. Los demandados contestaron separadamente y negaron los hechos. Después, el codemandado Gobernador Romero Barceló pidió la desestimación por prescripción y por no haber participado en los actos imputados.

El tribunal de instancia (Hon. Roberto R. Muñoz Arill, Juez) originalmente declaró sin lugar la desestimación. Después, ante una solicitud de reconsideración y una de sentencia sumaria, reconsideró. El 14 de abril de 1986 desestimó sumariamente la demanda bajo el fundamento que "el demandante ... sufrió daños, los conocía y conocía quien se los ocasionó desde el día 16 de febrero de 1978, fecha del arresto". Razonó, además, el ilustrado foro que "[l]a existencia de otros co-autores, así como de otros posibles da-

ños, pudo haberse descubierto durante el curso de una reclamación incoada en tiempo".

Mediante orden de mostrar causa, revisamos.

## II.

■ De entrada, hemos de aclarar que no estamos ante una alegada detención de arresto ilegal producto de la fabilidad humana de la Policía; esto es, una equivocación o error de juicio honesto y normal bajo la óptica de "motivos fundados" de la Regla 11(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, independientemente de que el delito se hubiese cometido. Esa situación —mero arresto de una persona inocente— usualmente no es base suficiente para configurar una causa de acción válida en qué fundamentar una reclamación en daños. Un arresto legal no se convierte en ilegal simplemente porque el imputado no sea hallado culpable. Se requiere una conducta en extremo negligente o criminal y maliciosa. *Romero Arroyo v. E.L.A.*, 127 D.P.R. 724 (1991); *Alberio Quiñones v. E.L.A.*, 90 D.P.R. 812 (1964); *Miguel v. Hernaiz Targa & Co.*, 51 D.P.R. 585 (1937); *Bivens v. Six unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

De ordinario, una trampa policiaca fraguada para arrestar y procesar falsamente a una persona no es asunto susceptible de ser descubierto fácilmente. La historia contemporánea así lo demuestra.

Los autos ante nuestra consideración reflejan que a la fecha de su arresto, Toledo Maldonado ignoraba la malicia y motivos aviesos de un plan criminal y de conspiración policiaca en su contra. Lo supo a través de la prensa varios años después. Ese desconocimiento no se debió a su negligencia o descuido. *Colón Prieto v. Géigel*, 115 D.P.R. 232 (1984). " '[U]na cosa es que la persona ignora que le asiste un derecho, y que por tanto desde entonces puede ejercitarlo, y otra bien distinta que de una forma más o menos

subrepticia se oculte al titular de un derecho una lesión del mismo, y que por tanto a partir de esta lesión —que se mantiene oculta— nace la correspondiente acción para hacer valer tal derecho'." Y " 'no puede entenderse nacida la acción cuando la lesión del derecho ocurra en unas circunstancias tales que supongan un acto clandestino u oculto del cual no pueda tener conocimiento el titular del derecho, que actúa con el grado normal de diligencia que establece la ley. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1979, T. I, Vol. 1, 2da parte, págs. 876–877". *Colón Prieto v. Géigel*, supra, pág. 246.

■ Y es que para el perjudicado ejercitar su acción " 'no le basta saber que lo ha sido, *sino que precisa conocer quién es el autor del daño*, para poder dirigir la demanda contra él, saber a quién debe demandar; *por lo cual, a la noticia del daño ha de añadirse la del que lo causó, para que corra la prescripción'*." (Énfasis en el original.) *Colón Prieto v. Géigel*, supra, pág. 247.

Esta normativa refleja que el ilustrado foro de instancia incidió. No procedía desestimar por prescripción.

## III

■ Ahora bien, lo anterior no dispone del recurso. No podemos ignorar el principio adjudicativo de que toda revisión se da contra la sentencia y no sus fundamentos. *García v. Montero*, 107 D.P.R. 319, 331 (1978). Bajo este prisma, es imprescindible dilucidar si era viable la desestimación por otras razones. El examen se impone, ya que en su solicitud de sentencia sumaria el codemandado Romero Barceló adujo, como motivo adicional, que el descubrimiento de prueba practicado entre las partes reflejaba que "la única base del demandante para alegar que este demandado tuvo participación en los hechos alegados en la demanda lo es una *doble prueba de referencia*, según la

cual el policía Jusino escuchó al codemandado Cartagena que tenía instrucciones de este codemandado [(Carlos Romero Barceló)], para fabricarle un caso". (Énfasis suplido.) Apéndice, pág. 12. A tales efectos, acompañó copia de la contestación al interrogatorio, en que Toledo Maldonado afirmó:

"2. Mi *único* testigo hasta la fecha es el policía Onofre Jusino. Su dirección es Laboratorio SKF, Inc. en Cidra, Puerto Rico. Declararía todo lo que sabe y en especial *que escuchó cuando el codemandado Desiderio Cartagena* dijo que tenía instrucciones del gobernador Carlos Romero Barceló de ponerme la bomba en las manos de fabricarme un caso." (Énfasis suplido.)

■ Frente a ese pedido, Toledo Maldonado simplemente descansó en sus planteamientos principales previos respecto a la desestimación por prescripción extintiva. Al hacerlo se corrió un gran riesgo jurídico, el principio reiterado de que para derrotar una solicitud de sentencia sumaria, el opositor debe presentar documentos que controviertan los hechos presentados por el promovente. *Tello, Rivera v. Eastern Airlines*, 119 D.P.R. 83, 87 (1987). Si no lo hace, se expone a una sentencia en su contra sin celebrarse un juicio en su fondo.

■ "La moción de sentencia sumaria obliga a presentar las pruebas que se utilizarían en el juicio para apoyar una alegación. Su efecto real es adelantar incidentes que podrían ocurrir en el juicio. A través de este mecanismo el tribunal puede considerar prueba que, de no ser adecuadamente refutada, permite que se disponga del pleito a favor de alguna de las partes." *Cuadrado Lugo v. Santiago Rodríguez*, 126 D.P.R. 272, 279 (1990).

El examen de los autos originales y demás documentos nos llevan a concluir que *procede*, como cuestión de derecho, desestimar sumariamente en cuanto al codemandado Romero Barceló. Expongamos los fundamentos de esta ruta decisoria.

## IV

La contención esencial del codemandado Romero Barceló es que Toledo Maldonado carece de evidencia admisible para probar sus alegaciones. Según propia admisión, consiste sólo de la declaración del policía Jusino, y la misma es inadmisible por ser prueba de referencia. Concentrémonos, pues, en este aspecto crucial probatorio.

■■■ *Prueba de referencia* es toda declaración que a su vez sea una aseveración —oral o escrita— que no hace el declarante al testificar en el juicio, y que se ofrece para probar la verdad de lo aseverado.[1] Regla 60 de Evidencia, 32 L.P.R.A. Ap. IV. De su faz, el testimonio que en su día ofrecería Toledo Maldonado contra Romero Barceló trata de una alegada declaración del Coronel de la Policía Cartagena hecha a un subalterno, el policía Jusino, en la cual supuestamente dijo que el entonces Gobernador Romero Barceló había dado instrucciones de fabricar un caso. La admisibilidad de esta prueba en el juicio en su fondo supone que Jusino se siente a declarar. A su vez, su condición de policía implica someramente examinar y delimitar quiénes son empleados o agentes del Gobierno a los fines de cuándo lo dicho por ellos puede ser considerado una *admisión vicaria* al amparo de la Regla 62(D) de Evidencia, 32 L.P.R.A. Ap. IV.

---

[1] Lo alegadamente dicho por Desiderio Cartagena es admisible bajo la Regla 62(A), 32 L.P.R.A. Ap. IV, por tratarse de una admisión "hecha por una parte, bien en su capacidad individual o representativa".

Dos (2) son los requisitos para la aplicación de esta excepción: que la declaración haya sido hecha por la parte y que se ofrezca precisamente contra la parte que la hizo.

Aunque ambos requisitos parecen ser uno mismo, en realidad no lo son; merece la pena distinguirlos si atendemos a la justificación para su admisibilidad. Precisamente, se debe a que la parte no puede objetar que el declarante no está sujeto a ser contrainterrogado, pues ella misma fue la que hizo la declaración.

Aquí, por el hecho de que Cartagena es codemandado, lo dicho por él a un testigo es admisible en su contra sin más requisitos que los señalados. Ciertamente, ello no resuelve el planteamiento sobre la inadmisibilidad de la declaración contra Romero Barceló.

■ Esa regla dispone que es admisible una declaración, aún siendo prueba de referencia, si "es hecha por el agente empleado de dicha parte referente a una materia dentro del ámbito de la agencia o empleo, durante la existencia de la relación ...". Regla 62(D) de Evidencia, *supra.*

■ De su lectura, lo primero que notamos es que este tipo de declaración se ubica en nuestras reglas de evidencia bajo el acápite de las admisiones, por su carácter de admisión vicaria. Sabido es que el vocablo *vicario* significa "aquel que tiene poderes y facultades de otro al cual sustituye". F. Gómez de Liaño, *Diccionario Jurídico*, AZ, Salamanca, 1979, pág. 325. Es decir, una admisión vicaria visualiza que la declaración del agente o empleado constituya una admisión hecha por el principal o patrono, en virtud de los vínculos que los une. No es necesaria la autorización expresa del principal o patrono para hacer la manifestación. A tal efecto, la Regla 62(D) de Evidencia, *supra*, exige dos (2) requisitos: que la declaración se haga durante la vigencia de la relación y se refiera a un asunto dentro del ámbito de la agencia o empleo.

"El primer requisito es necesario para el valor probatorio de la declaración. Si el declarante aún no es o ya no es empleado o agente de la parte, la base de la excepción se desvanece: que de ordinario el declarante no haga falsas declaraciones que perjudiquen al patrono o principal, porque con ello se perjudica él mismo .... En cuanto al segundo requisito, la clave es la probabilidad de que el empleado finja conocimiento sobre aquello de que habla." E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, Cap. VIII, pág. 300.([2])

---

([2]) En la esfera federal la cuestión sobre la aplicación de este tipo de admisión vicaria, cuando el patrono es el Gobierno, es objeto de debate. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1985, Vol. I, Cap. VIII, pág. 301, citando a *United States v. Kampiles*, 609 F.2d 1233, 1246 (7mo Cir. 1979). Véanse: *U.S. v. Delgado*, 903 F.2d 1495 (11mo Cir. 1990); *U.S. v. Van Griffin*, 874 F.2d 634, 638 (9no Cir. 1989); *U.S. v. Kattar*, 840 F.2d 118, 130–131 (1er Cir. 1988); *Hop-*

 Como toda declaración extrajudicial que cae dentro de la definición de prueba de referencia, la admisión vicaria presenta cuatro (4) áreas fundamentales de riesgo: "(1) narración del evento —debe presumirse que el lenguaje utilizado refleja fielmente la percepción del declarante; (2) percepción del evento —debe presumirse que el evento ha sido claramente percibido y correctamente interpretado; (3) recuerdo del evento —debe presumirse que la memoria del declarante es fiel a lo observado; y (4) sinceridad del declarante —debe presumirse que el declarante desea decir la verdad." (Énfasis suprimido.) *Pueblo v. García Reyes*, 113 D.P.R. 843, 853 (1983).

 La aplicación de los criterios que permiten una admisión vicaria contra el Gobierno, en un pleito civil, pone de manifiesto la ausencia de garantías clásicas de confiabilidad, requisito básico de toda excepción a la regla de exclusión de prueba de referencia. Ello nos obliga a examinar con cautela una declaración extrajudicial hecha por un empleado o agente del Gobierno. A fin de cuentas, en su dimensión operacional, el Gobierno no es un patrono cualquiera; sus funciones se ejercen a través de innumerables departamentos, agencias e instrumentalidades públicas, lo que de por sí representa un conglomerado de oficinas y servicios de distintos niveles jerárquicos, tipos y subalternos. Esta realidad exige que la implementación de la norma sobre admisiones vicarias se concrete dentro de unos parámetros razonados a tono con el fin probatorio

*towit v. Ray*, 682 F.2d 1237, 1262 (9no Cir. 1982); *United States v. Doe*, 655 F.2d 920, 924 (9no Cir. 1980); *United States v. Anderson*, 618 F.2d 487, 491 (8vo Cir. 1980); 4 *Louisell and Mueller, Federal Evidence* Sec. 426 (1980).

Cabe mencionar *United States v. Mandel*, 591 F.2d 1347, 1358 (4to Cir. 1979). Allí se resolvió que las declaraciones de los ayudantes legislativos del gobernador relativas a su posición y actuaciones referentes a los intentos legislativos de superar el veto, eran admisibles como admisiones de agente a principal. Se les consideró como sus agentes, y lo declarado admisible, por versar sobre asuntos comprendidos dentro del ámbito de esa agencia. Sin embargo, se dijo que las manifestaciones de los senadores del bando (partido) del gobernador, no lo eran. Véase Chiesa, *op. cit.*, pág. 302.

fundamental: *la búsqueda de la verdad*. Por lógica, no podemos configurar, sin más, una norma que impute como admitido por el Gobierno toda declaración extrajudicial de cualquiera de sus agentes o empleados. Es necesario demostrar el vínculo o relación y que la misma está comprendida dentro del ámbito de la agencia o empleo. En otras palabras, que existe una identidad entre el declarante y el Gobierno que hace confiable y justifica que lo declarado se considere una admisión vicaria. Con mayor razón, es necesaria esta demostración cuando se intenta imputar la admisión no sólo al Gobierno como ente jurídico, sino a la persona del funcionario en su capacidad oficial e individual.

Lo expuesto refleja la fragilidad de la contención de Toledo Maldonado contra el codemandado Romero Barceló. El testimonio del policía Jusino, que en su día ofrecería en el tribunal, es la típica prueba de referencia inadmisible: lo que oyó un testigo que otra persona dijo que un tercero había dicho. Hay una ausencia total de garantía circunstancial de veracidad. Más aún, ante la moción de sentencia sumaria descansó su caso en esa prueba de referencia, sin acreditar en modo alguno el fundamento que la hacía admisible en su día. Finalmente, no demostró la disponibilidad y la cualificación del declarante. Su posición es insuficiente para derrotar la moción de sentencia sumaria. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 721 (1986).

Por los fundamentos expuestos, *se dictará sentencia que confirme la desestimación de la demanda contra el codemandado Romero Barceló y que revoque en cuanto a los restantes codemandados*.

El Juez Presidente Señor Andréu García y la Juez Asociada Señora Naveira de Rodón se inhibieron. El Juez Asociado Señor Alonso Alonso no intervino.