ROBERTO MIRANDA RIVERA y SONIA PALACIOS GERENA, demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurridos.

*Número:* RE-92-563          *Resuelto:* 1ro de marzo de 1993

*Hiram Betances Fradera*, abogado de los recurrentes; *Raúl Santiago Meléndez*, de *Pérez Muñiz y Santiago Meléndez*, abogado de la Hermandad de Empleados Exentos No Docentes de la Universidad de Puerto Rico, en solicitud de intervención como *amicus curiae; Ada Font*, abogada de la Asociación Puertorriqueña de la Judicatura, en solicitud como *amicus curiae.*

---

## RESOLUCIÓN

A la anterior solicitud de revisión, *no ha lugar.*

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió un voto concurrente. El Juez Asociado Señor Fuster Berlingeri emitió un voto disidente, al cual se unió el Juez Asociado Señor Alonso Alonso. El Juez Presidente Señor Andréu García se inhibió.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

### — O —

Voto concurrente del Juez Asociado Señor Negrón García.

### I

El Hon. Roberto Miranda Rivera ocupa, desde el 20 de julio de 1989, el cargo de Juez del Tribunal Superior, el cual vence en 2001. Disfruta de una *licencia sin sueldo* de la Universidad de Puerto Rico, Facultad de Derecho (en adelante U.P.R.). Su esposa, la Lcda. Sonia Palacios Gerena, ostenta una plaza de Fiscal Auxiliar del Tribunal Superior, cuyo nombramiento expira en 1998.

A pesar de ser un miembro activo de la Judicatura y estar en licencia ordinaria *sin sueldo* de la U.P.R., el Juez Miranda Rivera continuó —y continúa— acogido al plan médico de dicha institución, pagándolo directamente por no tener derecho a la aportación al plan médico que hace la U.P.R. según la limitación recogida en la Certificación Núm. 201, 1980–1981, Consejo de Educación Superior. Es un dato no contradicho que el plan médico financiado por la U.P.R. brinda mayores y mejores beneficios que los planes contratados por el Secretario de Hacienda para los empleados y funcionarios de la Rama Judicial, el Departamento de Justicia y otros.

El Juez Miranda Rivera y su esposa, la Fiscal Palacios Gerena, alegan tener derecho a la aportación del Estado al plan médico por ser empleados públicos.

Aun cuando el Estado Libre Asociado acepta que cada uno es acreedor a esa aportación patronal para el plan médico ascendente a cuarenta dólares ($40), se la niega por haber ellos seleccionado el plan médico de la U.P.R., y no uno entre aquellos de "libre selección" a los cuales están limitados los demás empleados públicos, incluso los jueces, contratados por el Secretario de Hacienda.

Oportunamente, los esposos Miranda-Palacios acudieron al Tribunal Superior, Sala de San Juan, en petición de sentencia declaratoria. Luego de ciertos trámites, dicho foro (Hon. Antonio L. Corretjer Piquer, Juez) desestimó sumariamente la demanda. En su sentencia determinó que el plan de la U.P.R. era subastado y seleccionado directamente por esa entidad, *sin* la participación del Secretario de Hacienda, y que los empleados públicos podían optar por el plan médico de su preferencia sólo de aquellos seleccionados previamente por dicho Secretario. Concluyó que avalar la posición de los demandantes Miranda-Palacios significaría crear un privilegio. A juicio suyo, "estaríamos abriendo las puertas para que los funcionarios escogieran los beneficios que favorecieran a unos y otros sin pasar por el tamiz de la ley". *Exhibit* I, pág. 7.

No conformes, los esposos Miranda-Palacios acudieron en revisión, señalando como error de derecho haber el tribunal de instancia "interpret[ado] un estatuto reparador en forma restrictiva, desatendiendo así la voluntad expresa del legislador y la jurisprudencia de nuestro Tribunal Supremo". Recurso de revisión, pág. 4.

## II

En su señalamiento discuten que el proveedor de servicios médicos universitarios designado por ellos está también autorizado por el Secretario de Hacienda para ofrecer

tales servicios a los demás empleados y funcionarios públicos. Como restrictiva, objetan la interpretación de la Ley Núm. 95 de 29 de junio de 1963 (3 L.P.R.A. secs. 729a–729m) negándole dicho beneficio sólo por razón de que el plan de la U.P.R. no fue concertado a través del Secretario de Hacienda.

Brevemente, exponen la similitud de funciones que estatutariamente tiene asignado el Secretario de Hacienda, respecto a los planes médicos para los empleados públicos, y el Comisionado de Seguro, en cuanto a los planes que corresponden a los empleados de la U.P.R. Aluden a la identidad de propósitos en la participación de estos funcionarios para garantizar la existencia de un plan médico-hospitalario con proveedores solventes. Enfatizan que el Comisionado de Seguros es un funcionario que le responde al Secretario de Hacienda. Sostienen que la Ley Núm. 95, *supra*, por su naturaleza reparadora, debe ser interpretada liberalmente. Se quejan de que la sentencia ha convertido el requisito de participación del Secretario de Hacienda en un impedimento para otorgarles la aportación patronal concedida por la misma ley.

Finalmente, arguyen que el resultado del presente caso es contrario a la doctrina de enriquecimiento injusto.

### III

La situación peculiar del Juez Miranda Rivera se distingue([1]) por su condición de ser un miembro activo de la Judicatura, con un nombramiento y compromiso de servirle doce (12) años.([2]) No está en controversia que tanto él como

---

([1]) En este sentido se diferencia de cualesquiera otros empleados que no son jueces, en licencia ordinaria sin sueldo de la Universidad de Puerto Rico, y que reciben la aportación patronal al plan de la Universidad de las respectivas entidades donde se encuentran o encontraban prestando sus servicios.

([2]) "El término del cargo y los requisitos de idoneidad y de experiencia permanecen como antes, excepto que se aclara que estos últimos requisitos serán determi-

su esposa son acreedores a la aportación patronal para el plan médico del Estado Libre Asociado.

Independientemente del fundamento del tribunal de instancia en cuanto a su interpretación y aplicación de la Ley Núm. 95, *supra*, a los hechos de este caso, existe otro de mayor jerarquía que avala su dictamen. A fin de cuentas, toda revisión se da contra la sentencia y no contra sus fundamentos. *Toledo Maldonado v. Cartagena Ortiz*, 132 D.P.R. 249 (1992); *Villanueva v. Hernández Class*, 128 D.P.R. 618 (1991); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115, 127 (1988). Nos explicamos.

*Sabido es que el cargo de juez es uno a tiempo completo que no permite retribución o compensación alguna de otra entidad gubernamental.* La U.P.R. es un organismo estatal, aunque para fines de sueldos, beneficios marginales, planes de salud, retiro y otros funciona separadamente y bajo sus propias normas. Ello explica por qué el profesor Miranda Rivera tuvo que acogerse a una licencia *sin sueldo* para poder ocupar el cargo de Juez Superior.

*Un miembro de la Judicatura no puede mantener el papel de juez-profesor retribuido directa o indirectamente.*[3]

No tenemos duda de que acoger la alegación del Juez Miranda Rivera representaría que un juez en funciones obtendría beneficios marginales que sólo corresponden y son susceptibles de generar la condición de empleado ac-

---

nados por el poder nominador, según se provee en la Constitución; ningún juez así nombrado se tendrá como no cualificado para ser tal juez por un mero ataque a sus supuestas cualificaciones. La disposición expresa de la Ley Orgánica de la Judicatura de Puerto Rico de 1950 al efecto de que 'El tiempo dedicado por un abogado al ejercicio de la abogacía, al desempeño de cátedras de derecho, a la judicatura y a cargos públicos relacionados con la profesión legal, se considerará como experiencia profesional' indudablemente por ser obvia al poder nominador, queda omitida por superflua. Los jueces no podrán ejercer la profesión de abogado. Esto y la escala ascendente de sueldo dan énfasis al hecho de que el ser juez en Puerto Rico constituirá de ahora en adelante, *una carrera y no una diversión temporera.*" Informe del comité que redactó el proyecto de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 1952.

[3] No entramos, por no ser necesario, a explorar e interpretar la situación de autos bajo los Cánones VIII y X de Ética Judicial, 4 L.P.R.A. Ap. IV-A, u otras disposiciones legales.

tivo de la Universidad de Puerto Rico, situación que es incompatible con el *status* de juez. El beneficio aquí implicado consiste en mejores servicios médicos que no están disponibles para los otros miembros de la Judicatura. Se trata de una forma de retribución indirecta de otro organismo estatal. "Bajo la estructura constitucional vigente, plantearían serias interrogantes de legalidad e incompatibilidad el que se pretendiera que un juez ocupara un cargo creado por ley fuera de la Rama Judicial y nombrado por los otros dos poderes." *Negrón Soto v. Gobernador*, 110 D.P.R. 664, 667–668 esc. 3 (1981).

En estas circunstancias, no puede invocarse exitosamente la doctrina de enriquecimiento injusto según esbozada en *Ortiz Andújar v. E.L.A.*, 122 D.P.R. 817 (1988).

Procede denegar el auto.

— O —

Voto disidente del Juez Asociado Señor Fuster Berlingeri, al cual se une el Juez Asociado Señor Alonso Alonso.

La sentencia del tribunal de instancia en este caso ilustra, para mí, la sorprendente persistencia en el quehacer jurídico de un modo de interpretar y decidir que ha sido desde hace tiempo objeto de las críticas más severas. Me refiero al positivismo formalista extremo que reduce el razonamiento jurídico a una mera invocación de reglas y artículos, sin tomar propiamente en cuenta el sentido del Derecho ni los altos fines de bienestar social y de justicia que lo animan. R.M. Unger, *Law In Modern Society*, Nueva York, Ed. The Free Press, 1976, págs. 194 y 209.

Aquí se le niega a un juez un beneficio que las leyes del país conceden a todos los empleados públicos. Este trato desigual ocurre a pesar de que el foro de instancia en su sentencia, al igual que el propio Estado demandado, reconocen que el demandante, como empleado de la Rama Ju-

dicial, tiene derecho a una aportación patronal para su plan médico-hospitalario. Todos están contestes, además, que la Ley de Beneficios de Salud para Empleados Públicos, que establece la aludida aportación patronal, también consagra, como lo dice el propio estatuto, una *"absoluta libertad de selección"* (3 L.P.R.A. sec. 729g) para que el empleado público pueda escoger el plan médico-hospitalario que mejor le convenga. Tampoco hay disputa en cuanto a que el plan escogido por el demandante lo provee la Cruz Azul, que también es uno de los proveedores principales de los planes disponibles a los demás jueces y empleados públicos. Todo lo anterior, no obstante, se le niega al demandante la aportación patronal en cuestión porque el plan específicamente escogido por el demandante no es de "aquellos planes contratados por el Secretario de Hacienda" (*Exhibit* I, pág. 4), sino que es un plan contratado por la Universidad de Puerto Rico (en adelante U.P.R.), luego de haber recibido la debida autorización del Comisionado de Seguros de Puerto Rico, funcionario adscrito a la oficina del Secretario de Hacienda.

El resultado neto del dictamen de instancia es que el medular derecho a la aportación patronal y el fundamental principio de libre selección quedan totalmente subordinados a una interpretación literalista de la formalidad meramente instrumental de que el Secretario de Hacienda apruebe específicamente el plan en cuestión. Un elemento establecido por el legislador, sólo para asegurarle al propio empleado que el plan médico seleccionado por él es confiable, se eleva rígidamente por el tribunal de instancia a requisito tan indispensable que termina derrotando el fin legislativo. Se da la trágica ironía que un medio escogido para proteger al empleado se convierte, por *fiat* judicial, en un impedimento absoluto del beneficio que se le concede.

Este insólito resultado no es de modo alguno inevitable. Ello se hace patente con sólo indagar un poco en las razones por qué se estableció en la ley la intervención del Se-

cretario de Hacienda. Resulta que, originalmente, cuando se creó por primera vez el plan gubernamental para servicios médicos-hospitalarios para empleados públicos en 1946, la Cruz Azul era la única organización de fines no pecuniarios en Puerto Rico que ofrecía un plan similar al que se deseaba adoptar para los empleados gubernamentales. Por ello, la ley de 1946 disponía taxativamente que debía contratarse con la Cruz Azul. Años más tarde, para 1962, ya existían en Puerto Rico varias otras entidades y organizaciones que tenían planes de servicio de salud similares a los ofrecidos por la Cruz Azul. En consecuencia, se enmendó la legislación aludida para permitir que se pudiera contratar con varios aseguradores que ofreciesen planes de salud, en lugar de limitarse a un solo asegurador como había sido antes. Sin embargo, aunque se deseaba ampliar las opciones del empleado en términos de los planes disponibles, también se quería asegurar que los planes en cuestión fuesen *económicamente solventes y tuviesen la capacidad real de proveer los servicios que se contratasen.* Para ese fin se estableció la intervención del Secretario de Hacienda.

Como puede observarse, la función del Secretario —aunque de innegable importancia— es de carácter instrumental y no constituye la esencia del programa en cuestión. Lo que es más significativo aún, en este caso *no hay posibilidad alguna de que no exista la viabilidad económica del plan de salud escogido por el empleado que quiso asegurar el legislador,* no sólo porque se trata de un plan aprobado tanto por la propia U.P.R. como por el Comisionado de Seguros, sino porque el asegurador en cuestión —la Cruz Azul— ha sido históricamente el proveedor principal de estos servicios, y porque cuenta además, en la actualidad, con el visto bueno del Secretario de Hacienda como uno de los proveedores aceptados por éste.

A la luz de estos hechos, es menester concluir que en este caso *se cumplía sustancialmente con la previsión del*

*legislador en cuanto a asegurar la solidez del plan seleccionado.* Por ello es *irrazonable* e *injusto* negarle al demandante el beneficio que dispone la ley. El tribunal de instancia antepone un tecnicismo literalista sobre el derecho medular en cuestión. En efecto, se *conculca la parte primordial del mandato legislativo.*

La decisión del tribunal de instancia da al traste con reiteradas expresiones previas nuestras, como son, por ejemplo, nuestro pronunciamiento en *Andino v. Fajardo Sugar Co.,* 82 D.P.R. 85, 94 (1961), cuando señalamos que

> ... consideramos que dentro del proceso de hermenéutica tenemos la obligación de armonizar hasta donde sea posible todas las disposiciones de ley envueltas *con miras a lograr un resultado sensato, lógico y razonable* .... Para ello, los tribunales se apartan frecuentemente de una interpretación estricta o literal que conduzca a un resultado indeseable (énfasis suplido);

nuestro pronunciamiento en *Piovanetti v. Vivaldi,* 80 D.P.R. 108, 122–123 (1957), cuando advertimos de la necesidad de apartarse de los rigores y la inflexibilidad del automatismo y del ritualismo legal para no faltar al

> ... deber de impartir justicia y de hallar en cada litigio la verdad. ... Pero un pleito no es un juego que deba desarrollarse dentro de un marco bien ajustado por tecnicismos. Debemos repetirlo *ad nauseam,* aunque sólo consista en recordar lo admitido por todo el mundo, porque ningún sistema de derecho puede vivir si, a base de formalismos ... se ahogan las posibilidades de hacer justicia sustancial (citas omitidas y escolio omitido),

o el pronunciamiento del Juez Negrón Fernández en *Figueroa v. Díaz,* 75 D.P.R. 163, 175 (1953):

> ...El *sentido de injusticia* que inquieta a veces la conciencia en su busca de la verdad, y que como fuente espontánea de la formación del derecho contribuye con su corriente a la integración activa del acervo jurídico, marca una diferencia fundamental en la actitud práctica de los tribunales al convertirse en criterio adecuado para llegar a un verdadero *sentido de justicia*

en las controversias judiciales .... Las leyes se hacen por los hombres y se interpretan para los hombres. Por eso, en su interpretación, debe ser factor preeminente la realidad humana de la vida, no la abstracción dogmática de reglas .... En esta época de justicia social debemos marchar hacia la humanización de la justicia y el derecho, dejando atrás en su decadencia rigorista el sentido dogmático del derecho y la justicia.

En este caso, el tribunal de instancia, en auxilio de su jurisdicción, pudo haberle requerido al Secretario de Hacienda que expresase si tenía algún reparo respecto a los méritos del plan de la U.P.R. Así hubiese satisfecho su preocupación con el referido aspecto de la ley. De no haberlo, como probablemente no lo habría —por las razones señaladas antes— entonces el tribunal podía ordenar que se le diera al juez demandante lo que en derecho le pertenece, sin traba alguna. En lugar de seguir este curso, se prefirió denegar el derecho a la aportación, lo que no satisface mi sentido de justicia.

## I

Podría pensarse que si al demandante se le permite recibir la aportación patronal que es derecho de todos los empleados públicos para usarla en el plan de la U.P.R. en lugar del plan de la Rama Judicial, se le estaría permitiendo obtener *una opción que no está disponible para otros miembros de la Judicatura.* Tal en efecto sería la situación. Pero un examen objetivo y equitativo del asunto no podría terminar ahí. Habría que preguntarse también si es que hay algo ilegal o injusto en que el demandante tenga tal otra opción. No hay, claro está, nada ilegal o injusto en ello. La opción en cuestión surge de una circunstancia particular del juez, quien está disfrutando de una licencia sin sueldo de su cargo en la U.P.R.

Esta circunstancia ocurre con alguna frecuencia respecto a miembros del claustro universitario. Por su natu-

raleza como centro docente, la universidad es una reserva extraordinaria de recursos humanos en todos los campos del conocimiento y del saber profesional. Es, si se quiere, un "banco de talento" permanente al cual acude regularmente tanto el Gobierno como la empresa privada en busca de personas que necesitan para algunos de sus puestos principales. Ayer como hoy, *mediante el mecanismo de la licencia sin sueldo*, miembros del claustro universitario se han desempeñado como Gobernador de Puerto Rico, Comisionado Residente, Secretarios de gabinete, jefes de agencias, legisladores, rectores y presidentes de otras universidades, y jueces tanto del Tribunal Supremo como de foros de primera instancia. En casi todos estos casos, se le concede al funcionario público la licencia sin sueldo por algunos años para dejar abierta la puerta a que éste regrese a la universidad en algún futuro previsible, si su vocación académica persiste.

Esta consuetudinaria práctica de la U.P.R. ocurre tam-. bién en otras universidades del país y es elemento común de los buenos centros docentes de Estados Unidos y de otros países del mundo. Forma parte permanente del entramado universitario en el mundo moderno.

En la U.P.R. y en otros lugares, como parte del mecanismo de licencia sin sueldo, se le permite al claustral seguir unido a cosas tales como el plan de servicios de salud de la institución, si paga tanto la aportación personal como la patronal. Por lo tanto, no tratamos aquí con un privilegio injustificado ni mucho menos con una "retribución" ilegal. Se trata sencillamente de una opción que la universidad lícitamente le da de ordinario a todos los que, sin estar en servicio activo, continúan vinculados a ella como miembros del claustro.

Denegar la aportación gubernamental en cuestión al juez demandante sólo porque sigue vinculado a la U.P.R. no sólo es injusto con el juez, sino que, además, es una acción que atenta contra la autonomía universitaria y con-

tra la integridad de una consuetudinaria práctica que le ha servido bien al país y que aquí, como en otros lugares, ha sido parte importante del quehacer universitario. La práctica en cuestión, extendida a claustrales que forman parte también de la Judicatura, no le quita nada a los demás jueces ni los afecta adversamente. Al contrario, en una sociedad como la nuestra, donde ser juez con frecuencia implica serios sacrificios económicos y de otra índole, honrar la opción universitaria es un modo de alentar y promover el servicio en la Judicatura. No hay razón alguna, pues, por la cual al claustral que viene a ser parte de la Judicatura se le menoscabe una vinculación con la universidad que ordinariamente mantienen todos los otros claustrales que sirven en las otras ramas del Gobierno. No hay nada en la Judicatura como tal que justifique ese trato desigual.